The Young Men's Christian Association of St. Louis and St. Louis County (a Missouri charitable corporation), Respondent, v. Joseph P. Sestric, Assessor of the City of St. Louis, Missouri, et al., Appellants, No. 41738—242 S. W. (2d) 497.

Court en Banc, October 8, 1951.

552

*Emmet T. Carter, Gerald K. Presberg* for appellant School Board; *James E. Crowe,* City Counselor, *Albert Miller* and *John P. Mc-Cammon,* Associate City Counselors, for defendants-appellants.

*Wilbur B. Jones, Arthur J. Freund, Sam Elson* and *Salkey &
Jones* for respondent.

554

COIL, C.—Respondent obtained judgment below exempting certain of its properties in the City of St. Louis from taxation for state, county, and local purposes; cancelling the assessments and tax bills issued thereon for the years 1946, 1947, and 1948; enjoining appellant officials of the City of St. Louis from proceeding to attempt to collect such tax bills; and adjudging that the property in question is not subject to taxation for state, county, and local purposes so long as it is used exclusively for purposes purely charitable. This judgment was based upon a finding by the trial court that the properties were, during the calendar years 1946, 1947, and 1948, used exclusively for purposes purely charitable and therefore exempt from taxation, pursuant to the provisions of Art. X, Sec. 6, 1945 Const. Mo., and Sec. 137.100 R. S. Mo. 1949.

Appellant Board of Education of the City of St. Louis, by leave, intervened as a defendant.

We have concluded, for the reasons hereinafter set forth, that the judgment should be modified and affirmed as so modified.

The Young Men's Christian Association of St. Louis and St. Louis County (hereinafter sometimes referred to as YMCA) was organized as a pro forma decree corporation in 1877. Its articles of agreement have been amended from time to time. Since May, 1946 these articles state its purposes to be: "to help young people * * * To develop Christian character; To enlist them in a world wide Christian Fellowship; To aid them in building a Christian society by the maintenance of such eleemosynary activities and services as contribute to their physical, social, mental, and spiritual growth, and by such other means as may be conducive to the accomplishment of this purpose; and To provide for their welfare, at a minimum cost or where appropriate at no cost to them, by various desirable means, including the maintenance of places and facilities of study, recreation and abode of a homelike and Christian character and with wholesome and decent environment and guidance designed to foster good citizenship and Christian ideals and character."

YMCA is a unit of a national organization, is governed by a Metropolitan Board of Directors, and each of its branches is managed by a Branch Board of Managers.

The properties involved are three branches: Downtown Branch at 16th and Locust Streets, Pine Street Branch at Pine and Ewing Streets, and Northside Branch at Grand and Sullivan Avenues. These are three of a total of six branches in the City of St. Louis. There are five other branches in St. Louis County and four summer camps.

Downtown Branch is a ten-story building which may be generally described by floors: heavy machinery and equipment for the operation of the building is in the sub-basement; a cafeteria, wash rooms, barbershop, cleaning and pressing room, employees' locker room, and a swimming pool are in the basement; two offices, lobbies, game room, other recreation rooms, library, registration desk (including a magazine and candy counter), grill, and locker and shower rooms are on the first floor; on the second floor are meeting rooms including Brown Hall, a large assembly room, and the offices of the executive and secretarial staff; on the third floor are meeting and class rooms and offices for a "counseling and guidance service"; on the fourth floor are the offices of the Metropolitan Church Federation of St. Louis and of the staff of Metropolitan YMCA; handball courts occupy portions of the fifth, sixth, and seventh floors and except for such portions, the fifth to the tenth floors inclusive contain 361 residence rooms.

Pine Street Branch and Northside Branch are four-story buildings. Each of these may be described as containing in the sub-basement: boiler room and machinery and equipment for the operation of the building; in the basement: cafeteria, barbershop, game room, lockers, and swimming pool; on the first floor: combination lobby and assembly room, reception desk, executive office, secretary's office,

meeting room, tables for games in the lobby, and a gymnasium; on the second floor: assembly room, wash room, and some residential rooms; on the third and fourth floors: residential rooms.

Some of the activities and projects carried on, sponsored, or aided by, and which indicate the scope of the program of, YMCA are: sponsorship and supervision of numerous boys' clubs to prevent juvenile delinquency, and supervision of parolees from penal institutions; sponsorship and supervision of "community boys work" in which boys engage in varied supervised activities; operation of four summer camps; an informal educational program including courses in a large variety of subjects; an adult education program; sponsorship and supervision of special interest groups which participate in and study such subjects as photography, dramatics, and public speaking; religious programs; a comprehensive physical education program including not only the use of the recreational facilities at the various YMCA branches but which also includes organizing and supervising athletic leagues and teams; special services of various kinds for military personnel. All the foregoing activities, except the operation of the summer camps, involve the use of the properties in question. The entire program of YMCA, as its name implies, centers on a religious motive. The properties in question have come to be community centers in the sense that various religious and civic groups use the buildings for meetings and programs when the purposes of the organizations involved are compatible with the avowed purposes of YMCA.

The 361 rooms in Downtown Branch contained 496 beds in 1946 and 521 beds in 1947 and 1948. The 83 rooms in Pine Street Branch contained 180 beds. The 95 rooms in Northside Branch contained 143 beds. The charges made for these rooms varied, depending upon the branch, whether single or double bed or room, and price increases from time to time, from $4.00 to $9.75 per week per person. A charge of $1.75 per night was made for a single room when occupied for a period less than a week. The weekly charges were less than those of hotels.

A portion of the room charge is allocated to a membership fee. An application is completed by one desiring a room (unless he then presents a regular membership card in YMCA) which gives personal data including age, occupation, salary range, religious preference, educational background, condition of health, names of parents, references, the reasons for desiring residence at the YMCA, and an indication of program interests. A shorter application form is used for persons desiring a room for less than a week. After the application has been completed, a member of the secretarial staff interviews applicant who, if acceptable, is assigned a room. The application is then sent for approval to the executive director of the branch. During the years in question, primary consideration was given to young men with low incomes who lived outside the City of St. Louis; no persons

over 40 were permitted to occupy rooms except a selected number who furnished voluntary assistance in counseling and other YMCA activities. An attempt was made to refuse residence to men seeking. rooms from the sole standpoint of personal convenience as opposed to men with a desire to accept the benefits of the YMCA program, or as opposed to men who needed the environment and activities. Close supervision of the residence halls was maintained in an attempt to discover, assist in, and counsel concerning personal problems. The religious program was emphasized; well-rounded activity encouraged; employment problems discussed and, where possible, solved; and general guidance and counsel furnished.

The rooms contain no baths, lavatories, or telephones, these facili-' ties being available in common on each floor. The room charge is. fixed by a residence halls committee, a group of laymen, serving without pay, in conjunction with a paid secretary whose particular duty involves the operation of the residence halls. The charge is based upon a consideration of a desire to make available residence facilities for young men at nominal cost and a consideration of the expense of operation. The purpose is to cause the revenue from. the rooms to pay the cost of the maintenance of the rooms.

Compilations prepared by regular auditors for YMCA for the years involved show an over-all excess of expense over income for the entire YMCA program for 1946 of $266,063.92; for 1947 of $280,309.03; and for 1948 of $293,898.06. YMCA is a member of the Greater St. Louis Community Chest, a nonprofit organization which solicits and collects money from the public and allocates and distributes the money to various agencies in St. Louis and St. Louis County. Allocations made to YMCA in 1946 totalled $188,140, of which $18,440 was a special allocation for services to men in the Armed Forces. In 1947 the allocation totalled $218,700 including a $24,000 special allocation. In 1948 the allocation totalled $216,148.07 including a $5,029.06 special allocation. . The over-all operation of the three branches here involved showed an excess of expense over income for 1946 of $116,810.32; for 1947 of $116,366.94; and for 1948 of $124,009.66.

Operation of the residence halls in the three branches showed an excess of expense over income for 1946 of $2,263.79; an excess of income over expense for 1947 of $21,927.54; and an excess of income over expense for 1948 of $35,550.85; or a total excess of income over expense for the three years of $55,214.60. ·

Cafeterias operated in the branches furnish good food of limited selection at moderate cost. Food prices are determined by a food service manager with the approval of a lay committee of the branch board of managers. Purchase and consumption of food in the cafeterias is not limited to members of YMCA. No effort is made by

advertising or otherwise to gain public patronage. Nonmembers, particularly persons who are daily employed in the immediate area of the branch in question, use the facilities of the respective cafeterias. Some nonmembers become members by reason of their patronage. The grill for light lunches and fountain service is not restricted to members. Consideration has been given by YMCA to restricting the use of cafeterias and grill to members. The restriction was not made because of the desirability of obtaining a group of potential members and because of a feeling of obligation to the community at large. Meals are furnished by YMCA by special arrangement and at agreed prices to religious and civic organizations which meet for lunch or dinner in meeting rooms, the charge being confined to the price of the meal not including any charge for the meeting room. Operation of cafeterias in the three branches for the years involved resulted in an excess of income over expense for 1946 of $140.89; an excess of expense over income for 1947 of $27,579.58; and an excess of expense over income for 1948 of $27,805.26; or a total excess of expense over income for the three years of $55,243.95.

Barbershops in Downtown and Northside Branches are operated by union barbers who are employees of the YMCA. Service is not restricted to members, but the location of the shop and the service offered are not advertised and the patronage of the general public is not otherwise solicited.

There are candy, tobacco, and magazine counters which sell these items and miscellaneous personal items such as shaving supplies, which may be purchased by anyone who is in the particular building.

A laundry service at Downtown and Northside Branches consists of an arrangement between YMCA and a commercial laundry whereby the clothing of residents (although not formally restricted to residents) is left at a certain place on the premises by the individual and is picked up and returned by the laundry. YMCA is billed by the laundry for the total charges; individual charges are paid to YMCA by the residents. The laundry, in billing YMCA, makes a 15 per cent reduction in the total bill.

In Downtown Branch is a clothes cleaning, pressing, and repair service for which usual charges are made and which service is not limited to members.

In the physical education departments are sold various items of athletic equipment at popular prices to anyone using the facilities or premises. In the athletic department a charge is made for soap and towel.

A circus produced and staged by Pine Street Branch, the net income from which is used to partly defray the expense of operation of a summer camp, is held in Kiel Auditorium, a municipal building of the City of St. Louis.

The operation of barbershops, laundry service, candy and tobacco counters, cleaning and pressing facilities, and gym store, resulted in an excess of income over expense for 1946 of $3,835.30; an excess of income over expense for 1947 of $2,171.09; and an excess of expense over income for 1948 of $296.23.

In certain instances food, lodging, and other facilities are furnished without charge to boys and young men who are stranded or are in situations which, after investigation, seem to justify the action. There is an obligation to repay any advance which is made.

Memberships in YMCA are of various kinds for which different rates are charged, depending upon the activities in which the member desires to participate. Some free memberships are provided for boys unable to pay. Members include occupants of the residence halls as well as nonresidents. Athletic facilities are furnished free of charge to various boys' groups and other organizations which use the branches. Membership is not restricted denominationally.

No portion of any of the properties here involved is rented, leased, or otherwise let to any person, firm, or corporation.

Article X, Section 6, Mo. Const. 1945, provides in part that: "* * * all property, real and personal, not held for private or corporate profit and used exclusively for religious worship, for schools and colleges, for purposes purely charitable, or for agricultural and horticultural societies may be exempted from taxation by general law."

Section 137.100, R. S. Mo. 1949, provides in part that: "The following subjects shall be exempt from taxation for state, county or local purposes: * * * (6) All property, real and personal, actually and regularly used exclusively for religious worship, for schools and colleges, or for purposes purely charitable, and not held for private or corporate profit shall be exempted from taxation for state, city, county, school, and local purposes; provided, however, that the exemption herein granted shall not include real property not actually used or occupied for the purpose of the organization but held or used as investment even though the income or rentals received therefrom be used wholly for religious, educational or charitable purposes."

We are mindful of the settled rule that exemption statutes are strictly but reasonably (so as not to curtail the intended scope of the exemption) construed. We also have in mind that charitable use exemption depends upon the use made of the property and not solely upon the stated purposes of an organization. Salvation Army v. Hoehn, 354 Mo. 107, 188 S. W. (2d) 826; Missouri Goodwill Industries v. Gruner, 357 Mo. 647, 210 S. W. (2d) 38.

Whether the avowed purposes of respondent are purely "charitable purposes" depends, of course, upon the definition of, and the concept of, "charity" and "charitable purposes." Under a broad concept of the term "charitable purposes," there can be no doubt that

the stated purposes of YMCA to assist young people in developing Christian character and Christian fellowship, to aid them in building a Christian society by activities and services which contribute to their physical, social, mental, and spiritual growth, and to provide for the welfare of young people by furnishing facilities and places of abode in a wholesome and Christian environment, do amount to "charitable purposes." "Charitable purposes" include those, the accomplishment of which makes it likely that persons affected will become substantial and useful citizens and less likely that they will become burdens on society. The purposes of YMCA are "charitable purposes" within a reasonable definition of that term. Salvation Army v. Hoehn, supra; Missouri Goodwill Industries v. Gruner, supra; Bader Realty & Investment Co. v. St. Louis Housing Authority, et al., 358 Mo. 747, 217 S. W. (2d) 489.

██ ██ Did respondent exclusively use the properties in question for the charitable purposes expressed in its articles of agreement?

On three other occasions this respondent has called upon this court to declare exempt from taxation the properties (or certain of them) here involved. On each occasion exemption was refused. These cases in chronological order are State ex rel. Edmond Koeln, Collector of City of St. Louis v. St. Louis YMCA, et al., 259 Mo. 233, 168 S. W. 589; State ex rel. St. Louis YMCA v. Gehner, City Assessor, et al., 320 Mo. 1172, 11 S. W. (2d) 30; and St. Louis YMCA v. Gehner, City Assessor, et al., 329 Mo. 1007, 47 S. W. (2d) 776, 81 A. L. R. 1449. In discussing these cases, we shall refer to them as the first, second, and third YMCA cases.

In the first YMCA case, exemption was denied because portions of the ground floor of the two buildings involved were rented to others for use as commercial stores. Although the revenue received from these rentals was used for the purposes of YMCA, this court held that such rental defeated the exemption claimed because the facility was thereby not exclusively used for educational, religious, and charitable purposes.

The facts in the second and third YMCA cases were substantially the same, and very similar to the facts in the present case, except that in the second YMCA case the use of facilities was restricted to members only and except that in the present case the use of facilities was essentially limited to young men in a low or limited income group. In the second and third YMCA cases, exemption of the property was denied because we held that the operation of rooming facilities, cafeterias, barbershops, pressing establishment, and soda fountains constituted commercial activities and that thus the buildings were not used exclusively for purely charitable purposes.

This court, by subsequent decisions in Salvation Army v. Hoehn, supra, and Missouri Goodwill Industries v. Gruner, supra, held that the second and third YMCA cases were ruled upon the erroneous ap-

plication of an unreasonable rather than a reasonable construction of the exemption provision; that a too restrictive definition of "charitable purposes" had been applied.

In Salvation Army v. Hoehn, supra, there was involved a building, Evangeline Residence, including a basement and 13 stories at 1803 Pine Street, owned and operated by Salvation Army. The question was whether this property was exempt from taxation by reason of the constitutional and statutory provisions here involved. The objects and purposes of The Salvation Army were "to further the work of the Christian Church known as The Salvation Army, and to engage in charitable, educational, missionary, philanthropic and religious work of the character that has been and is being conducted by the branch of the Christian Church known as The Salvation Army, and to do everything, and to act and carry on every kind of operation necessary and incidental to the maintenance of such beneficial, educational, charitable, missionary, philanthropic and religious work, but that all of such work shall be conducted not for pecuniary profit * * *." (188 S. W. (2d) 827). Contained in the building on the first floor were various rooms including a lobby and dining room, kitchen, library, employees' rest room, chapel, and secretary's office. On the second floor were a housekeeping room, linen room, manager's apartment, storage rooms, etc. On eleven floors were bedrooms, each with private bath and telephone. Residents in the building were restricted to women and girls. An application calling for personal data was completed by an applicant before residence was permitted. The weekly charge for a room and 15 meals in the year 1942 (the year of taxation involved) was $11.50 per week per person for a single room and 15 meals, and $9.50 to $10.00 per person per week for a double room and 15 meals. Telephone calls from the room were charged at a rate of 10¢ each, no charge being made for incoming calls. A charge was made for use of an electric iron, when such use exceeded an hour at one time, at the rate of 10¢ per hour. Two hundred sixty-nine girls and women lived at the Evangeline Residence. Prices charged were considerably less than in hotels in the immediate vicinity. The Evangeline Residence operated at a loss of some $21,000 for the year ending September 30, 1940, at a loss of some $8,000 for the year 1941, and at a loss of some $3,800 for the year ending September 30, 1942. For the year ending September 30, 1943, there was a gain, in that there was an excess of income over expenses, of some $4,400. The loss over the four-year period was a total of $29,388.83, which loss was met from the general fund of the Salvation Army. Consultations were held with the residents as to personal problems; guidance and counsel were furnished by Salvation Army officers, one of whom was on duty continuously. Classes in certain subjects were conducted for a time but certain of them were discontinued because of the nonavailability of instructors.

This court, on the facts related, held that the property was exempt. In the opinion, the three YMCA cases heretofore referred to were reviewed and it was said: "The rule of strict construction in the matter of exemption from taxation is not questioned, but 'strict construction must be a reasonable construction.' Y. W. C. A. v. Baumann, 344 Mo. 898, loc. cit. 902, 130 S. W. 2d 499, loc. cit. 501. We think that the construction given Sec. 6, Art. 10, Constitution, in the second and third YMCA cases is too strict, that is, not reasonable. Such construction confines the concept of charity solely to the relief of the destitute, and excludes all humanitarian activities, though rendered at cost or less, which are intended to improve the physical, mental and moral condition of the recipients and make it less likely that they will become burdens on society and make it more likely that they will become useful citizens. Prior to the second YMCA case the legal concept of charity, in Missouri, was not confined solely to the relief of the destitute." (188 S. W. (2d) 829, 830).

And further: "It will be noted that in the second Y.M.C.A. case, 320 Mo. 1172, 11 S.W. 2d 30, there was cafeteria service to invited friends of members, regardless of need, and transient rates were charged those who occupied a room for less than a week, and perhaps there were other services of a commercial nature. In the third Y.M.C.A. case, 329 Mo. 1007, 47 S. W. 2d 776, 81 A.L.R. 1449, the setup, services and charges were about the same as in the second, except that the service was confined to members only, and in both, so far as appears, services, rooms, etc., were not limited, as in the present case, to a low income group. But any ruling in the YMCA cases contrary to our ruling in the present case should be and the same is overruled." (188 S. W. (2d) 831).

In Missouri Goodwill Industries v. Gruner, supra, the collection of certain tax bills on parcels of real estate was enjoined by the lower court for the reason that the property in question was used exclusively for purposes purely charitable. As shown by the opinion, respondent's charter purposes were: "For benevolent and educational purposes, for the industrial, moral and ethical training of the poor and neglected; the encouragement of thrift and healthful conditions of living and labor; the prevention of pauperism and the relief of the temporary distresses of the unfortunate." (210 S. W. (2d) 39). The opinion described the operation of respondent and said: "Y.M.C.A. v. City of Philadelphia, 323 Pa. 401, 187 A. 204, denied tax exemption to the Y.M.C.A. because its building containing lodging facilities was primarily commercial in character. We came to the opposite conclusion in Salvation Army v. Hoehn, 354 Mo. 107, 188 S. W. 2d 826, 829. In that case, cited by both parties in the instant case, we held non-taxable a building operated as a hotel by the Salvation Army for women of low income. We

reviewed many of our prior decisions and adopted a broader concept of the term 'charity' than that now urged upon us by appellants." (210 S. W. (2d) 40).

In Y.W.C.A. et al. v. Baumann, 344 Mo. 898, 130 S. W. (2d) 499, we held that the operation of a cafeteria by the YWCA during the year 1932 did not destroy the exclusiveness of the use of the property for purely charitable purposes for that year. (130 S. W. (2d) 502).

Appellants suggest two reasons for the inapplicability of Salvation Army v. Hoehn, supra, to the present case. They say that in the Salvation Army case the residents ▮▮▮ paid from $4.15 to $6.15 per week for rooms with bath and telephone and $5.35 for fifteen meals per week, pointing out that such are lesser charges than those appearing in this case. Appellants also urge that Evangeline Residence in the Salvation Army case operated at a deficit, whereas respondent in this case shows a $55,000 profit in the operation of the residence halls during the years in question. We think neither of the suggested reasons is controlling nor, upon analysis, amounts to a basic difference in the facts of the two cases. The charges in the Salvation Army case were made in 1942 while the charges in the present case were made during the years 1946 to 1948 inclusive. Further, the fact that there was a lesser charge per room and a smaller charge for food in the Salvation Army case cannot be a fundamental consideration or distinguishing feature. The Salvation Army was apparently seeking to benefit a lower income group than the group of young men which the YMCA seeks to benefit. The record herein contains considerable testimony to the effect that the purpose of the operation of the residence halls and other questioned facilities is to bring within reach of a group of young men whose incomes are definitely limited, the opportunity to live in an attractive Christian environment. In the Salvation Army case, while the opinion shows that there was an over-all deficit, it also shows that for one year, ending September 30, 1943, there was a profit of $4,400. Further, as we shall hereinafter point out, the controlling consideration cannot be solely whether a profit or a loss was in fact realized or sustained.

Upon an analysis of the facts in the three cases (Salvation Army v. Hoehn, supra, Missouri Goodwill Industries v. Gruner, supra, YWCA v. Baumann, supra) and an analysis of the facts in the present case, and having in mind the basic principles involved in the three decisions, we are unable to perceive any fundamental distinction between those cases and this one. Any difference appears to be a difference in degree, not a difference which affects the principles of law involved.

The YWCA, Salvation Army, and Goodwill cases granted tax exemptions because the uses made of the properties were intimately

connected with the accomplishment of the purely charitable purposes of the organizations and because the uses themselves did not have for their purposes the making of profit. A distinction should be clearly made between such situations and one in which there is use of property, the purpose of which use is to make profit, even though the profit is made for the express purpose of being used, and is used, to further and accomplish a purely charitable purpose. And this is true even though the use of the property may be said to be reasonably connected with the purely charitable purposes of the corporation.

This court, in Evangelical Lutheran Synod, et al. v. Hoehn, City Assessor, et al., 355 Mo. 257, 196 S. W. (2d) 134, denied tax exemption to a religious publishing house, even though all profits were used for religious purposes, because the publishing house was a competitive commercial business whose primary purpose was profit. Thus, in the present case, if the uses made of the YMCA property had been such that the primary purpose of such uses was to make profit, then the respondent would not be entitled to tax exemption even though any profit, or excess of income over expense, accruing from the uses of the facilities was used to accomplish the purely charitable purposes of the organization.

Is the purpose of YMCA in the operation of its facilities in question (residence halls, cafeterias, grill, barbershops, candy and tobacco counters, cleaning and pressing shop, gym stores, and athletic departments) to make profit; or is the use made of the property for the purpose of effectively accomplishing the purely charitable charter purposes, i.e., furnishing to young men a total environment in order to effectively accomplish the development of Christian character and Christian fellowship and in order to foster good citizenship and Christian ideals? Each of these tax exemption cases is peculiarly one which must be decided upon its own particular facts. It is ▉▉▉ true, as asserted by appellants, that the record here shows that in the operation of certain of the facilities there was an over-all excess of income over expense. And it may be, as also contended by appellants, that some of the figures contained in the compilations furnished by YMCA auditors are not as accurate as they might be and that, depending upon the viewpoint, some of the excesses of expense over income do not exist, at least to the extent indicated. These inaccuracies, if such they be, appear to be due to the bookkeeping methods of the type of institution involved, which makes it most difficult to accurately separate operations of particular facilities from total operations. However that may be, whether a particular facility made a profit or suffered a loss for any particular year, the fact of such profit or loss and the amount thereof, would simply be evidence (and in many circumstances, most persuasive evidence) on the proposition of whether the

purpose of the use was to make profit. Just as the testimony in this record of YMCA officers and secretaries, and of the food service manager in charge of the Downtown Branch cafeteria in the years mentioned, that the operation of YMCA facilities was not with the idea or purpose of making profit is also evidence on that question.

The trial court found as a fact from the evidence in the record: "That the purpose of the plaintiff in maintaining residence halls or dormitories in its three buildings on the properties hereinbefore described, together with the provision for service of meals, and for barber and laundry service and the sale of incidentals, including candy, periodicals, smoking and other supplies, and conveniences as shown by the evidence, is to provide for the welfare of young men and boys, especially and preferably those of lower earning capacity and income, by various desirable means, including particularly the maintenance of places and facilities of study, recreation and abode of a homelike and Christian character and with wholesome and decent environment and guidance designed to foster good citizenship and Christian ideals and character; that the provision of board and lodging in a protected and educational and religious environment for the purposes and under the circumstances shown by the evidence is in itself a charitable activity intimately related, incidental to and part of the charitable, educational, religious and eleemosynary activities of the plaintiff; that the provision of said facilities is not for the purpose of making profit but is for the purpose of providing charity of a practical sort, and the provision and maintenance thereof dovetails into and rounds out the charitable purposes of plaintiff." We rule that this finding is supported by the record and is correct.

Appellants contend that because Art. X, Sec. 6 of Mo. Const. 1945 is markedly similar to Art. X, Sec. 6 of Mo. Const. 1875, the adoption of the 1945 Constitution was in effect an adoption of the construction of the 1875 constitutional provision as indicated by the first, second, and third YMCA cases, supra. We think appellants' contention is untenable. This, for the reason that we have held in Salvation Army v. Hoehn, supra, and in Missouri Goodwill Industries v. Gruner, supra, that the second and third YMCA cases, decided under the provision contained in the 1875 Constitution, unreasonably construed the exemption provision in that they unduly limited the concept of charity. These decisions, therefore, even though subsequent to the adoption of the 1945 Constitution, nevertheless, determined that Art. X, Sec. 6 of the 1945 Constitution should not be construed as though the YMCA cases had been "adopted in" or "written into" the provision. Furthermore, as pointed out in Salvation Army v. Hoehn, supra (188 S. W. (2d) 829, 830 [4, 5]), a different construction of Art. X, Sec. 6 of

the 1875 Constitution than that contained in the second and third YMCA cases was indicated by decisions of this court prior and subsequent to the dates of the decisions in the three YMCA cases. It is obvious, therefore, that Art. X, Sec. 6 of the 1945 Constitution was not written or adopted to include a construction of the provision as indicated in the three YMCA cases to the exclusion of a different construction indicated by the prior and subsequent cases referred to in the Salvation Army opinion.

 Appellants also contend that the matters here in controversy are res judicata by reason of the adjudications contained in the first, second, and third YMCA cases, supra. Appellants say that the parties were the same and the facts were identical in the three YMCA cases with the facts of, and the parties in, the present case. There is identity of parties. As to identity of facts, we have heretofore noted that in the first YMCA case the record showed that portions of the property were rented to commercial enterprises, a fact not present in this case. Inasmuch as the first YMCA case was decided upon the existence of that fact, its absence in this case constitutes a sufficient factual difference to make the present case not res judicata by reason of the adjudication in the first YMCA case. We have also heretofore noted that the facts in the second and third YMCA cases were substantially the same and substantially like the facts in this case except that, in the second YMCA case, the use of facilities was restricted to members and except that, in the present case, the facilities were essentially limited to young men of a low income group. It should be noted that Art. X, Sec. 6 of the 1945 Constitution eliminates the acreage limitation contained in the 1875 Constitution and extends the exemption to personal as well as real property; that Sec. 137.100 R. S. Mo. 1949, the implementing section for the 1945 Constitution, contains a proviso not included in Sec. 10937 R. S. Mo. 1939, the implementing section for the 1875 Constitution. This proviso is: "* * * provided, however, that the exemption herein granted shall not include real property not actually used or occupied for the purpose of the organization but held or used as investment even though the income or rentals received therefrom be used wholly for religious, educational or charitable purposes." It is respondent's contention that the addition of the proviso above noted indicates a broader scope of exemption as to use, and that the differences in the factual situation (restriction to young men in the low income group and providing housing and meals for releasees from penal institutions) in this case from the factual situations in the second and third YMCA cases, together with the differences noted between the 1875 and the 1945 Constitutions, demonstrate that the prior YMCA cases are not res judicata of the present case. Without deciding, but assuming, that the facts in the second and third YMCA cases and the facts in

the present case are sufficiently similar to and amount to the same facts, we hold that this case is not res judicata because of the adjudications in the second and third YMCA cases. We held in the Salvation Army and Goodwill cases that the second and third YMCA cases unreasonably construed the exemption provision, and we have held herein that, under the reasonable construction of that provision as applied in the Salvation Army and Goodwill cases, respondent's property is exempt. To hold this case res judicata would result in applying forever one rule of law between two parties (YMCA and the City of St. Louis) and another rule of law among all other parties in similar or the same factual situations. The injustice of any such application of res judicata or collateral estoppel is at once apparent. Since the adjudications in the second and third YMCA cases, judicial decision has created a new situation and respondent should not be precluded from having accorded it the same treatment as to taxation as is accorded any other charitable corporation in like circumstances.

In tax cases each year's tax is a separate transaction and each action relating to each year's tax is a new cause of action. In Re Breuer's Income Tax, 354 Mo. 578, 190 S. W. (2d) 248, 250.

While it is true that res judicata and collateral estoppel, or estoppel by judgment, apply to tax cases as well as to other litigation (State ex rel. Blair v. Mining Company, 262 Mo. 490, 171 S. W. 356), nevertheless, it is also true that there is limited application of these doctrines in tax cases particularly, and the ▮▮▮ doctrines are not applied at all when obvious injustice would result. Where, as here, the erroneous construction of a constitutional provision has caused one result between two parties and thereafter a different construction of the same or similar constitutional provision has caused a different result between two other parties in similar factual situations, the taxpayer adversely affected by the first erroneous construction is not barred from presenting the same facts for adjudication under the later and different rule of construction.

"The determination of a question of law by a judgment in an action is not conclusive between the parties in a subsequent action on a different cause of action, even though both causes of action arose out of the same subject matter or transaction, if it would be unjust to one of the parties or to third persons to apply one rule of law in subsequent actions between the same parties and to apply a different rule of law between other persons." Restatement, Judgments, 1948 Supplement, Sec. 70, Comment f.

In the case of In Re Breuer's Income Tax, supra, we held that an unappealed abatement of a 1940 state income tax assessment, was not res judicata of a similar assessment for 1941 and 1942. Concerning the contention that the former judgment was conclusive because it involved the same parties and the same issues, we said: "Furthermore, the question herein presented is purely a question of

law on the meaning of income in our income tax law. The rule, in this situation, stated by the American Law Institute, is as follows: 'Where ·a question of law essential to the judgment is actually litigated and determined by a valid and final personal judgment, the determination is not conclusive between the parties in a subsequent action on a different cause of action, except where both causes of action arose out of the same subject matter or transaction; and in any event it is not conclusive if injustice would result.' Restatement of Judgments, § 70, p. 318. This rule is particularly applicable to tax questions. See Restatement of Judgments, pp. 324, 325. The tax for each year is a separate and distinct transaction and each action for collection is a different cause of action from those of prior years. It would give one taxpayer an unfair advantage over others, and be unjustly discriminatory, if through inefficiency or neglect of the collecting officers, to appeal an erroneous decision on a question of law, it should be held that he would be relieved for all time from paying taxes all others must pay. We, therefore, hold that the judgment in the 1940 tax abatement proceeding is not res judicata of the question of law herein presented." (190 S. W. (2d) 250). The principle applied in the Breuer case is squarely applicable to the present case. See also Commissioner of Internal Revenue v. Joseph Sunnen, 333 U. S. 591, 68 S. Ct. 715, 92 L. Ed. 898, 906, 907, and Busch v. Commissioner, 175 Fed. (2d) 391, 393.

 The judgment entered by the trial court deals with the status of this property for tax purposes subsequent to the year 1948. While the evidence in the record did, to an extent, deal with·uses of the property up to the time of trial as well as with uses of the property in 1946, 1947, and 1948, nevertheless the matter adjudicated was the status of the property for the years 1946, 1947, and 1948 only. We think the judgment, insofar as it deals with subsequent years, is too broad. Judgment in this case should not go beyond the specific years involved. It is true that so' long as the properties in question are used exclusively for purely charitable purposes, they are and will be exempt from taxation. The judgment and decree of the trial' court should be modified to eliminate therefrom language which deals or purports to deal with the status of the property involved other than for the years 1946, 1947, and 1948. The judgment should also be modified to include a description of the properties involved.

The cause is remanded with directions to modify the judgment and decree in accordance with the views expressed herein and, as so modified, the judgment is affirmed.

 PER CURIAM:—The foregoing opinion by Coil, C., is adopted as the opinion of the Court en Banc. All concur.