**Leo A. DREY, Plaintiff-Appellant,**

v.

**STATE TAX COMMISSION of Missouri, James M. Robertson, Chairman, and John A. Williams, J. Ralph Hutchison, Commissioners of the State Tax Commission of Missouri, Jink Smith, Assessor, Shannon County, Missouri, and Donald D. Searcy, Collector of Shannon County, Missouri, Defendants-Respondents.**

Nos. 48118–48120.

Supreme Court of Missouri,

Division No. 1.

April 10, 1961.

Henry C. Lowenhaupt, St. Louis, Robert S. Allen, St. Louis, for plaintiff-appellant.

Friend B. Greene, Eminence, Dorman L. Steelman, David C. Harrison, Salem, for respondents.

HOUSER, Commissioner.

Here for review is the action of the Circuit Court of Shannon County dismissing an aggrieved taxpayer's appeals and affirming the orders of the State Tax Commission upholding real property tax assessments for the years 1957, 1958 and 1959 upon 88,725 acres of wild timberland located in Shannon County. In each of those three years taxpayer Leo A. Drey appealed the assessment to the Shannon County Board of Equalization. In each year the board denied a reduction and the taxpayer petitioned the commission for a review of the assessment. The commission refused to hear and dismissed the 1957 appeal, whereupon taxpayer petitioned the circuit court for judicial review of the decision of the commission. Failing to get relief in the circuit court taxpayer appealed to this Court, which reversed the judgment affirming the commission's order dismissing the petition for review, and remanded the case with directions to remand the case to the commission for the purpose of exercising jurisdiction over taxpayer's appeal of the 1957 assessment. Drey v. State Tax Commission, Mo.Sup., 323 S.W.2d 719. Meantime the commission conducted a hearing on the 1958 appeal, and denied a reduction in the 1958 assessment. Taxpayer sought a judicial review of that order by filing a petition in the circuit court. Drey v. State Tax Commission, supra, was handed down before the circuit court acted. Thereupon the county officials (who had prevailed before the commission) filed a motion in the circuit court to remand to the commission to permit them to adduce additional evidence with respect to the 1958 assessment. The circuit court sustained the motion and remanded the case to the commission. Accordingly, there were three appeals pending after the 1959 appeal reached the commission. All three appeals were set for hearing on the same day and they were heard together on November 9, 1959. By letter dated December 18, 1959 the commission notified taxpayer that it had denied relief in all three appeals. Taxpayer appealed to the circuit court, which affirmed the commission's orders and dismissed all three appeals. From the three judgments of the circuit court taxpayer has appealed to this Court. By agreement of the parties approved by this Court the record in the 1959 appeal is considered as filed in all three cases; the parties filed one set of briefs, and the three appeals were heard together as one for the purpose of decision.

■ This Court has jurisdiction of these appeals for the reason, among others, that the construction of the revenue laws of this state are involved. Koplar v. State Tax Commission, Mo.Sup., 321 S.W.2d 686.

Taxpayer's petitions for review alleged that the assessments were excessive, erroneous, unlawful, unfair, unequal, improper, arbitrary, capricious, fraudulent, void and unconstitutional because they were excessive, and disproportionate. Taxpayer claimed they were excessive because they: (1) were grossly in excess of true value; (2) failed to take into account the depletion resulting from the cutting of timber from the land, and severe losses from drought and fire, in 1954, 1955 and 1956, as a result of which the value of the land was diminished by considerably more than one million dollars; (3) exceeded the amount of the assessment for 1955 as reduced by the judgment of the Circuit Court of St. Louis County; and (4) were entered without notice to taxpayer. Taxpayer claimed they were disproportionate because unequal and discriminatory as compared with assessments on other and comparable property, in violation of § 3 of Article X and §§ 2 and 10 of Article I of the Constitution of

Missouri, V.A.M.S., and of the 14th amendment to the federal Constitution.

On this appeal taxpayer contends that under the overwhelming evidence the assessments were unlawful, unfair, arbitrary and capricious; that the commission erred in excluding and giving no weight to certain evidence, failing to correct the assessments, denying and violating taxpayer's constitutional rights, failing to accord taxpayer a fair trial and in making decisions which were arbitrary and capricious; that the orders of the commission were not supported by competent and substantial evidence upon the whole record, and that the circuit court therefore erred in affirming the commission's orders.

Taxpayer's case consisted of his own testimony; that of his chief forester; certain admissions made by the assessor at the 1958 hearing, and numerous documents, all of which tended to show the following:

Taxpayer, a resident of St. Louis County, began purchasing wild timberland in central Missouri in 1951. By 1957 he had purchased 131,376 acres in the Counties of Shannon, Texas, Carter and Reynolds, in 99 separate transactions. His holdings in Shannon County were purchased in 14 separate transactions. Taxpayer purchased 87,415 acres from National Distillers Products Corporation on June 1, 1954. That land, assessed on January 1, 1954 at $376,655, or an average of $4.31 per acre, was sold to taxpayer for $361,393, National reserving all white oak timber 15 inches and over in diameter at breast height, and the right to enter, cut and remove same (300,000 board feet were excluded from the reservation). The subject matter of the reservation was old growth timber, probably the finest timber in the state. After June, 1954 taxpayer, in 12 separate transactions, bought an additional 1,330 acres in Shannon County, for $5,285 (an average cost of $3.97 per acre). By January 1, 1955 taxpayer had purchased a total of 88,725 acres in Shannon County, at an average cost of $4.12 per acre. Sales prices of timberlands in Shannon County to state

forestry service over the last few years, by and large, have averaged between $3 and $4 per acre. In 1954 National cut and removed 9,270,340 board feet of white oak timber under its reservation. Taxpayer sold 782,493 board feet, which was removed before January 1, 1955. Taxpayer's whole forest (in all four counties) suffered an extremely heavy drought loss in the summer of 1954, calculated by taxpayer at an excess of 12½ million board feet, worth $12 a thousand. Notwithstanding the standing timber was thus reduced by cutting and drought and the interest of National in the timber under its reservation had been severed from taxpayer's interest, all interests in the land were assessed to taxpayer on January 1, 1955 (the assessor not separately assessing National's interest), and the assessment was not reduced but was made in the same amount as the previous year, $376,655. Taxpayer unsuccessfully appealed the 1955 assessment to the Board of Equalization of Shannon County and the State Tax Commission. He then appealed to the Circuit Court of St. Louis County, which found that the standing timber reserved by National constituted an interest in land taxable only to National and not to Leo A. Drey, the purchaser of the land, and that the assessment had been made on the improper legal assumption that the purchaser was liable to be taxed on the gross value of the land including the standing timber, and modified the order of the commission fixing the assessed value of taxpayer's lands for 1955 at $376,655 by excluding the assessment of the interest of National, and ordered that Leo A. Drey's interest in the land be assessed at $108,207. The assessor was directed to correct his records accordingly. This judgment became final on January 17, 1958. In 1955 taxpayer sold 2,704,105 board feet from the land and National cut 9,012,470 board feet. On January 1, 1956 the land was again assessed to Leo A. Drey in the amount of $376,655. In 1956 taxpayer sold 2,343,817 board feet from the land, while National in 1956, completing its "harvest" or "liquidation" cut under its

reservation, cut 990,860 board feet. In the three years National cut a total of 19,273,-670 board feet. In that period mature oak timber standing on the stump was worth between $50 and $100 per thousand board feet. The gross value of the land was decreased roughly by one million dollars by National's liquidation. When it completed its harvest cut, National on November 29, 1956 released the timber reservation in writing. On January 1, 1957 (six weeks after the circuit court ordered the 1955 assessment reduced to $108,207) the land was assessed to Leo A. Drey for $440,775 (15% in excess of previous assessments), an average of $4.96 per acre. In 1957 taxpayer sold 1,334,672 board feet from the land and in 1958, 1,469,578 board feet. On January 1, 1958 and January 1, 1959 the land was assessed to Leo A. Drey at $4.96 per acre. For all of the timber, of all species, cut and sold by taxpayer since 1954 (a total of 8,600,000 odd feet), an average of about $12 per thousand board feet was received, for a total amount of $104,000, according to taxpayer's estimate. As of November, 1959 in the entire forest of 131,376 acres taxpayer, "speaking in generalities," guessed that there remained 100,000,000 board feet of timber, of all species, including the nonmerchantable 20% of species that are not salable and that which is scattered and not operable. Notwithstanding losses by fire, storm, theft, and reductions by cutting, a substantial part of the more than 9,000,000 feet of pine estimated in a cruise in 1952, and approximately 12,000,000 feet of hickory (for which there is no market), plus the growth of seven years, remains on the entire forest. In 1958 taxpayer estimated that there were 40,000,000 to 50,000,000 feet of red oak in the entire forest. His 1958 estimate of the mature timber in Shannon County only, then ready to harvest, counting the 20% of soft woods and other timber for which there is no market, was roughly 20,000,000 feet, consisting of 10,000,000 feet of oak, principally red oak, and 10,000,000 to 12,000,000 feet of nonmarketable hickory and other poor species which are not salable. There were seven sections left on which there was an appreciable or significant volume of old growth red oak timber. There was also 300,000 feet of old growth virgin white oak, excepted from the National's reservation, preserved as a relic for show purposes. Taxpayer indicated that it would be "ridiculous" to find the value of timberland by determining the number of thousand board feet and the average price per thousand, and multiplying the two factors. In operating on an 80-year rotation, improving a forest and on a long-term basis, it would not be realistic to liquidate and sell all timber on the property at one time; to do so would dispose of the inventory and "put you out of business." Proper operation calls for improvement (not harvest) cuts, by which the forest is selectively improved until an optimum situation is reached in which there is a sustained yield and an annual cut of mature trees. In the preliminary period of improvement taxpayer has not been able to sell enough timber to cover expenses. Counting taxes, expenses of maintaining the forest, salaries to foresters and all other operating expenses, as against income from the property from all sources, taxpayer has sustained (exclusive of depreciation of slightly more than $10,000 per annum) an average loss for the years 1954–1957, both inclusive, of "well over $34,000 a year, out of pocket." Taxpayer's federal income tax returns show a loss for five years of $155,-196, including an average annual depletion of $9,981, for an average annual loss of $31,039. Published figures show that timber in southern Missouri is growing at the rate of 52 board feet per acre per year. Taxpayer testified that 20% of the timber is not merchantable, and estimated a gross appreciation by growth of timber of 50¢ per acre per year. He testified that he is cutting an average of 30¢ per acre per year, so there is a net appreciation of something like 20¢ per acre per year. Taking his average sales price of $12 per thousand board feet, taxpayer figured that he was growing about 50¢ per acre per year and paying 16¢, or one-third of his gross, in property taxes.

On behalf of the county evidence was introduced tending to show that taxpayer's lands are worth, on the average, $15 to $20 an acre; that they are assessed at 30% of their market value, and upon a basis of uniformity with all other timberlands in the county. The county's witnesses did not base their opinions upon prices obtained in the sales of this or comparable timberlands, but principally upon their estimates of the amount and quality of the timber remaining on the lands, based upon their knowledge of the lands from living in the community and from Jeep rides through parts of the lands, the springs, rivers, river and highway frontages and occasional sales of cabin sites. On the Jeep rides (made in September, 1959) estimates of the quantity of timber on 66 sections (approximately 42,248 acres) of the taxpayer's lands, according to the following standards of quality, were made: Poor: very little timber of any value; Fair: Above average for Shannon County; Good: Timber averaging not less than 1,000 board feet per acre; Pole pine: Pine that will make fence posts and telephone and highline poles; Saw timber: Timber ready to be cut. For instance: "Section 9 Township 30 North Range 4 West—South ½ Fair to good Black Oak, Some good Pine." The compilation (Exhibit 2) did not undertake to put a value on any of the timber, nor did it compute the number of board feet of the various species of timber either on a parcel, section, or total basis. No actual cruise of the timber was made except a one-acre cruise in Section 8, Township 28, Range 5, which "looked average." On that one acre they counted all the trees and estimated the footage in each tree. Twenty-seven oak trees scaled 1,900 feet and seven pine trees scaled 600 feet, for a total of 2,500 feet, but it was admitted that this one-acre cruise was no fair indication of the amount of timber per acre on the entire 88,725 acres. Exhibit A was a report or study comparing 210 parcels of land belonging to Leo Drey with 93 parcels of land adjoining or located in the same sections with Drey land. Separate columns listed the owner's name, section, township, range, number of acres, assessed valuation and average value per acre. This information was compiled from the 1958 Shannon County Tax Books. A sixth column contained a short description of the particular parcel of land and the salable timber on it, rated as Poor, Medium or Good. Poor timber was from 0 to 200 feet per acre; Medium was from 200 to 500 feet per acre; Good was from 500 to 800 feet per acre. Exhibit A was compiled by the county clerk, who gained his information with respect to the land and timber partially from personal observations but principally from discussions and personal interviews with farmers, land owners, residents and timbermen. Taxpayer objected to Exhibit A as hearsay but the commission decided to "let it stand as it is." Taxpayer's forester went through Exhibit A section by section and testified that pine, red oak and white oak had been cut in 31 sections of the Drey lands listed therein. None of the county's witnesses testified that any cut-over wild timberlands in Shannon County had sold for more than $5 per acre. There was evidence, however, that very few of taxpayer's acres were worth as little as $5, and that no timberland could be bought in 1959 for $5 an acre. There was testimony that taxpayer's lands are comparable in make-up with the lands of T. J. Moss Tie Company (none of the 73,000 acres of which had cost over $8 an acre), and the other large acreages of wild timberlands in the County. The county pointed to taxpayer's testimony as to the amount of timber standing on the land and its market value, and suggested that the timber alone was worth more than the amount for which the lands were assessed. There was no evidence, however, of the cost of cutting and hauling the timber.

The provisions of the constitution and statutes preserving to a complaining taxpayer a right to appeal an assessment and prescribing the duty and function of the State Tax Commission to investigate and correct any assessment shown to be unlaw-

ful, unfair, improper, arbitrary or capricious, and the rebuttable presumption of correctness which attends tax assessments, are set forth in Koplar v. State Tax Commission, supra, 321 S.W.2d loc.cit. 692, 693, and need not be repeated here. The basic principles applicable to the review of assessments generally are reviewed in Cupples Hesse Corporation v. State Tax Commission, Mo.Sup., 329 S.W.2d 696, 700. Further elaboration here is unnecessary.

■ The scope of our review of the decisions of the commission [1] on this appeal requires us to determine whether the action of the commission is in violation of constitutional provisions; unsupported by competent and substantial evidence upon the whole record; unauthorized by law; made upon unlawful procedure, or involves an abuse of discretion.

■ We are of the opinion that the orders of the commission are not supported by competent and substantial evidence upon the whole record. That conclusion is compelled by a consideration of certain facts and evidence which demonstrate that the commission reasonably could not have found that the 1957, 1958 and 1959 assessments made by the county assessor were correct and proper. The following evidence was either adduced by the county, or expressly or tacitly conceded by the county to be correct, or was uncontradicted and unimpeached evidence adduced by taxpayer which could not be ignored by the commission in reasonably arriving at a conclusion. When the assessor, elected in 1952, took office he assessed the land "like it had been, practically the same as it was already," adopting the assessment of the previous year. The assessment of January 1, 1954 was in the sum of $376,655. In the assessor's opinion *the assessment in 1954 was a proper assessment.* There was no substantial evidence in the record that the assessments in 1952, 1953 and 1954 were not based upon the then true value of the land.

On January 1, 1954 title to the land was in National; the sale to taxpayer and the severance of interests had not occurred. The assessment of January 1, 1954 included all of the standing white oak timber later reserved by National, of which more than 19,000,000 board feet worth in excess of one million dollars, were cut and removed from the land by National in 1954, 1955 and 1956. When the assessment of January 1, 1957 was made the assessor knew that National had been cutting timber from taxpayer's land "for a long time" and had cut "large quantities" of mature, virgin white oak timber. He knew that National had released its timber reservation. The assessor admitted that he received a letter from taxpayer informing him of the cutting and asking for a reduction of the assessment based upon the depletion, but he "didn't pay any attention" to the letter; did not go out on the land and examine the sections referred to in the letter, which specified where the cutting had taken place; did not inquire or investigate as to the value of the cuttings. He said that he "didn't have time." In 1957, 1958 and 1959 the same assessor proceeded to assess the land at $440,775, which was 15% *in excess* of the amount at which the land had been assessed on January 1, 1952, 1953 and 1954, notwithstanding in the interim the land had been denuded of 19,000,000 board feet of white oak timber worth more than one million dollars by National's cuttings, many more millions of board feet of timber by taxpayer's cuttings, and more than 12,500,000 board feet of timber (in the whole forest) by reason of losses from fires, storms and thefts. Asked if the taking of one million dollars of timber off the land would have any effect on the value of the land the assessor admitted that "it should," but sought to justify the anomaly of increased assessment coincident with decreased value by expressing a doubt that the land "ever was assessed what it ought to have been when the timber was on it." This doubt, unsupported by any other testimony

1. Constitution of Missouri, 1945, Art. V, § 22; § 536.140, subd. 2, RSMo 1949, V.A.M.S.

and contradictory of the assessor's acts and previous positive testimony that the 1954 assessment was "a proper assessment," is insubstantial and without value. There is no substantial evidence in this record of any marked appreciation in the value of these cut-over timberlands in the interim, or of any substantial intervening growth of timber, reasonably sufficient in even small measure to compensate for such extensive depletion; nor is there substantial evidence of any other factor which would tend to support the assessor's conclusion that these timberlands, admittedly denuded of more than a million dollars in virgin timber from 1954 to 1956, increased 15% in value by 1957. Under these facts and circumstances the commission's orders approving assessments which wholly ignored such extensive depletion in value are not supported by substantial evidence on the whole record. In reaching that conclusion we have not overlooked the opinion evidence on value given by the assessor and others which, standing alone, might constitute substantial evidence supporting the 1957–1959 assessments. Whatever substantiality that opinion evidence might otherwise have is destroyed by the circumstances discussed heretofore, disclosing the assessor's unaccounted for and unsupported failure to give weight to the fact of the extensive depletion shortly prior to 1957.

Taxpayer considers the circuit court judgment fixing the 1955 assessment at $108,207 as strong, indeed presumptive, evidence of the proper current assessment, and on this appeal relies with confidence on the fact that the assessor ignored and the commission refused to admit the judgment in evidence. Although he knew that the circuit court reduced the assessment and directed him to adjust his records accordingly and notwithstanding he was served with a notice of the judgment, the assessor admitted that instead of correcting his 1955 assessment by reducing it from $376,655 to $108,207, as ordered by the court, he "just put it back where it was" the year before. In answer to the question "Disregarding the judgment?" the assessor answered "Yes." He left the 1956 assessment at $376,655. He *increased* the 1957 assessment to $440,775, applying a 15% blanket increase to the previous figure undiminished, *instead of applying it to a figure influenced by the judgment.* The assessor admitted that nothing occurred in the intervening time between the judgment and the later assessments to alter his opinion of the value of the land except "a little increase every year in value" by reason of the growth of the timber. [One witness testified that there had been an increase in value of land in Shannon County of one third or more between 1949 and 1959, but there was no evidence of the extent of the increase between 1955 and 1957, 1958 and 1959. In any event the assessor conceded that land value did not increase four times in value in the interval (from the $1.24 per acre assessment by the circuit court for the year 1955 to the $4.96 per acre assessment by the assessor for the years 1957, 1958 and 1959)]. The commission refused to consider the judgment. One commissioner expressed the opinion that the 1955 assessment "has no bearing on the '57, '58 and '59" assessments, and that the judgment is "irrelevant" and has "no bearing whatever in this case." The chairman sustained an objection to the certified copies of the record of the judgment, stating "We cannot accept them."

While a judicial determination of the assessed value of property for tax purposes for one year is not conclusive under the doctrine of res adjudicata as to the value of the property for assessment purposes at a subsequent year, see in this connection In re Breuer's Income Tax, 354 Mo. 578, 190 S.W.2d 248, and Young Men's Christian Ass'n of St. Louis et al. v. Sestric, 362 Mo. 551, 242 S.W.2d 497; Annotation 150 A.L.R. 5; People ex rel. Hilton v. Fahrenkopf, 279 N.Y. 49, 17 N.E.2d 765, it is evidence which is *admissible* on the question. 84 C.J.S. Taxation § 410, p. 786, footnote 67. And as the judgment of a court having jurisdiction of

the parties and of the subject matter it would be entitled to respect, unless it was void on the face of the record. LaPresto v. LaPresto, Mo.Sup., 285 S.W.2d 568, 570. Since these cases must be remanded and the commission will be faced with the question on the rehearings we have considered whether the judgment was void on the face of the record, notwithstanding the precise point was not raised, and have determined that insofar as it undertakes to modify the commission's order and itself fix the assessed value of taxpayer's land at $108,207 the judgment is void on its face for the following reasons: A court cannot substitute its discretion for the discretion legally vested in the agency, § 536.140, subd. 5, or make a determination of the value of the property and fix the amount of the tax assessment upon record evidence from which different conclusions might be drawn in the exercise of administrative discretion. A court has jurisdiction to enter an order modifying the agency's order fixing the amount for which property should be assessed only if the record reveals established facts, i. e., facts standing in the record as "admitted, proved or conceded," upon the basis of which the amount may be declared as a matter of law. Koplar v. State Tax Commission, supra, 321 S.W.2d loc. cit. 696, 697. The preliminary recitals upon which the judgment was based contain findings which clearly reveal that the circuit court "confused evidence with established fact and substituted its discretion for the discretion legally vested in the State Tax Commission," in contravention of the rule. From the preliminary recitals it is abundantly clear that the Court weighed the evidence; rejected the county's evidence of value of taxpayer's property; accepted taxpayer's testimony as not impeached and as "the only proper testimony" before the commission; determined from taxpayer's testimony that the purchase from National was an arm's length transaction and that "the purchase price represented the fair market value of his interest" in the property; determined the value of taxpayer's property upon the basis of tax-

payer's testimony that he paid $4.12 an acre and taxpayer's testimony that the assessment should be 30% of the market price, and thereupon fixed the assessment at $108,207. The findings of a court must be of a character sufficient to support the judgment rendered. Wenzel v. Wenzel, Mo.App., 283 S.W.2d 882; 49 C.J.S. Judgments § 45, p. 106. The court's findings do not reveal that the court acted upon the basis of established, admitted or conceded facts and that the court was merely declaring the amount of the assessments as a matter of law. Instead, the findings reveal that the court was drawing its own conclusions as to the facts and exercising its own discretion upon the basis of testimony from which, conceivably, different conclusions might be drawn. A judgment based upon findings of fact of record which clearly show that the court acted in excess of its jurisdiction, is void.

■ The commission made a finding on the 1957 and 1959 appeals that it was the policy of Shannon County to assess all property in the county at approximately 30% of its true value, and on the 1958 appeal that "petitioner's property is assessed on an equal and comparable basis with other forest land in Shannon County." The latter finding is doubtless supported by competent and substantial evidence on the whole record. Whether the 1957 and 1959 findings are thus supported may be debatable, but the evidence clearly reveals an implied approval, if not an adopted policy, on the part of the local assessing authorities of subclassifying real estate in Shannon County for the purposes of taxation. We recognize that inequalities in assessment are inevitable; that perfect equality in assessment and exactitude in the distribution of the tax burden upon the owners of different types and kinds of real estate is not humanly possible. Like classification of real property and uniform taxes upon the same class of subjects, however, are not only possible but are required, by Constitution of Missouri, 1945, Art. X, §§ 4(a) and 3, respectively. There

are no subclassifications of real estate for the purposes of taxation. Cupples Hesse Corporation v. State Tax Commission, Mo. Sup., 329 S.W.2d 696, 699. All property is to be assessed "at its true value in money," § 137.115 RSMo 1949, V.A.M.S., and all placed upon the same basis. An intentional plan or design of discrimination by which one kind or class of property is systematically assessed at a higher percentage of its value than other property in the county works a constructive fraud upon each property owner thus discriminnated against. Boonville Nat. Bank v. Schlotzhauer, 317 Mo. 1298, 298 S.W. 732, 55 A.L.R. 489; Jefferson City Bridge & Transit Co. v. Blaser, 318 Mo. 373, 300 S.W. 778; T. J. Moss Tie Co. v. Allen, infra. When not the result of mere error of judgment, and when intentional discrimination is established, the assessment cannot stand. Koplar v. State Tax Commission, supra.

■ The testimony of three county officers, the assessor, a member of the county board of equalization, and the county clerk, suggests that on remand the commission should make further inquiry to determine whether these standards were met; whether there was an intentional plan of discrimination, and whether there was such discrimination in fact in the assessment of the lands of the complaining taxpayer. We refer to the testimony of the assessor at the 1959 hearing that in assessing *farm lands* and *town lots* they "try" to arrive at about 30% of the value, but that in assessing *timberlands* he assessed "Not below thirty cents and not over a hundred. * * * [I]t goes from thirty to a hundred; it could go either way, from thirty to a hundred per cent." The county surveyor, a member of the board of equalization thoroughly familiar with the county's assessment policy, indicated that different types of property are assessed differently, by testifying that while farm lands ordinarily ran about 30% the average assessment on town lots was less than 30%. The county clerk, after testifying that the county was "pretty fairly equally assessed"

explained that by this he did not mean that farm lands, town lots and timberlands are all assessed on an equal basis, but meant that *timberlands* on the average are more or less equally assessed; that farm lands in the north part of the county are not assessed the same as in the south part; that new houses are not assessed on the same basis as old houses, and that in speaking of equal assessment he was not "talking about the ratios between farm land and urban land and forest land and urban land." The assessments in 1957, 1958 and 1959 are further rendered suspect by the testimony of the assessor that the assessment policy in 1954 and 1955 (during the administration of the same assessor) was to assess timberlands at $3.60 an acre (a flat-rate assessment). That an arbitrary, flat-rate assessment of all timberlands in a county cannot stand was decided in T. J. Moss Tie Co. v. Allen, Mo.App., 8 S.W.2d 1038. It seems hardly necessary to add that all wild timberlands must be assessed on an equal and comparable basis with all lands in the county whether rural or urban, farm land or timberland, improved or unimproved; that town lots, farm lands and wild timberlands may not be classified separately and assessed at different rates (less than 30%, 30%, and 30 to 100%, respectively), and that the constitutional requirements are not met by the assessment of all wild timberlands in the county on an equal, comparable and reasonably uniform basis while intentionally, designedly and systematically applying different rates to other entire classes of real property.

■ In its investigation of the propriety of the assessments on rehearing the commission should take into consideration all properly proven factors and circumstances bearing upon the true value of taxpayer's lands in money. Two factors of importance, which among others, see 84 C.J.S. Taxation § 411(f), p. 806, "Timber and Timberlands," should be considered in determining the true value in money of these timberlands are:

(1) *The purchase price paid for the lands by taxpayer:* While the purchase price paid for property is not conclusive as to its value for tax assessment purposes, it is a factor of importance and significance for the commission to consider. If, as taxpayer's evidence shows, lands purchased in 1954 for $365,547 (an average of $4.12 per acre) were assessed in 1957, 1958 and 1959 for $440,775 (an average of $4.96 per acre), and if the commission finds that the condition of the real estate market in 1954 was normal; that the purchases of these various tracts were open transactions between competent parties dealing at arm's length, and that there was no sudden and marked increase in the value of the lands in the interim (which the record here for review does not indicate), the question arises whether the commission gave serious consideration to the purchase price as an item of evidence of value.

(2) *Sales prices of comparable property:* Taxpayer offered to prove that he had purchased 39,986 acres of wild timberlands in adjoining Reynolds, Texas and Carter Counties for a total of $150,983 (an average of $3.99 per acre). Some inconclusive and desultory evidence was introduced by taxpayer indicating that taxpayer's lands in these adjoining counties were comparable to his lands in Shannon. The commission refused to admit the evidence. The commission is allowed wide latitude in determining whether there is sufficient similarity in pertinent comparison factors for the sales prices of other lands to be of assistance in determining value,[2] and ordinarily land in another county would be too far removed physically to provide a valuable basis for comparison. Where the property being valued consists of a vast tract of more than 88,000 acres of timberlands in southern Missouri, and the lands being held up for comparison consist of nearly 40,000 acres of timberlands, and the sum total of all of the acreage, lying in four counties, is held and used together by the same owner as one single, integrated forestry unit, the separation of the tracts by county lines loses its significance, and the ordinary limitations on the rule are inapplicable. Consequently, on rehearing, the commission should consider sales prices of taxpayer's timberlands in other counties, provided taxpayer introduces sufficient preliminary evidence that the lands are comparable, similarity of market conditions on dates of purchase and dates of assessment, whether they were arm's length transactions, etc.

At the rehearing the parties should introduce evidence from which the commission, in fixing taxpayer's assessed valuation for the years 1957, 1958 and 1959, may determine what proportion of value the assessor of Shannon County placed upon *the general mass of other taxable property in the county.* Boonville Nat. Bank v. Schlotzhauer, supra.

■ Taxpayer asks this Court not to remand the case, thereby requiring taxpayer to go further through "this labyrinth of administrative procedure," but to "cut the Gordian knot" and adjudicate the assessments here without further delay. We have discussed the power of a court under § 536.140, subd. 5 to *modify* the commission's decision and have stated that a court may not substitute its discretion for discretion legally vested in the agency. We have determined that the orders of the commission are not supported by substantial and competent evidence upon the whole record, and that the assessor pursued an improper procedure productive of discrimination in the assessment of taxpayer's timberlands. The determination of a proper assessment, of the proportion of the true value in money placed upon the general mass of taxable property in the county, and the extent to which the assessments should be changed by the influence of factors previously discussed, are matters of discretion dependent upon the introduction

2. See City of St. Louis v. Vasquez, Mo.Sup., 341 S.W.2d 839, for a statement of the rule in condemnation cases.

of evidence from which different conclusions may be drawn. On this record this determination may not be made by this Court as a matter of law, but is one which must be made by the commission in the exercise of its administrative discretion.

The orders and judgments of the circuit court with respect to the three appeals from the State Tax Commission are reversed and set aside and the three causes are remanded to the circuit court with directions to enter an order in conformity with this opinion and remand the causes to the State Tax Commission for reconsideration in the light of this opinion and judgment.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.