**UNION ELECTRIC COMPANY d/b/a Ameren Missouri, Appellant,**

**v.**

**Christopher ESTES, Assessor, Cole County, Missouri, Respondent.**

**WD 80659**

Missouri Court of Appeals, Western District.

OPINION FILED: September 26, 2017

CORRECTED October 13, 2017

Motion for Rehearing and/or Transfer to Supreme Court Denied October 31, 2017.

Application of Transfer Denied December 19, 2017

---

William R. Price, Jr., St. Louis, MO, for appellant.

Richard Reed, Kalamazoo, MI, for respondent.

Before Division Three: Alok Ahuja, Presiding Judge, Thomas H. Newton, Judge and Cynthia L. Martin, Judge

Cynthia L. Martin, Judge

Union Electric Company, d/b/a Ameren Missouri ("Ameren") appeals from a circuit court judgment which upheld the Missouri State Tax Commission's ("Commission"), decision and order affirming the 2013 assessed valuation of Ameren's natural gas pipeline real property in Cole County, Missouri as determined by the Cole County Assessor ("Assessor"). Because the Assessor applied the reproduction cost valuation methodology without considering depreciation, we reverse the circuit court's judgment, and remand this matter for further proceedings as herein described.

## Factual and Procedural Background

Ameren is a regulated public utility. Ameren transmits and distributes natural gas in various counties in eastern and central Missouri. The 2013 valuation and assessment of the components of Ameren's natural gas pipeline that qualify as real property located in Cole County is the subject of this appeal.

Pursuant to section 137.010(4),[1] the term "real property" for purposes of the assessment of property taxes includes "stationary property used for transportation or storage of liquid and gaseous products, including, but not limited to, ... natural gas...." Ameren owns real property as so defined, as it maintains a natural gas pipeline transmission and distribution system through 25 counties in the State of Missouri, including Cole County. Ameren's real property in each of these counties is subject to assessment every two years for the purpose of calculating annual real property taxes owed to each county. Section 137.115.1.

County assessors are authorized by section 137.115 to require those with a possessory interest in property subject to assessment to file property lists. The lists required by section 137.115 are required to contain, among other things, a list of all real estate in which one holds a possessory interest. Section 137.120.

---

1. All statutory references are to RSMo 2016, except as otherwise referenced.

The Commission is statutorily authorized to require county assessors to determine the assessed value of all real property and tangible personal property subject to taxation by using forms prescribed by the Commission. Section 138.380(2) and (5). Section 138.320 provides that "suitable forms and instructions" prepared by the Commission and provided to county clerks and officers "shall be strictly complied with by the officers in the performance of their respective duties." Consistent with this authority, the Commission promulgated a three-page form for natural gas distribution companies to use in 2013 to report real property and tangible personal property in service as of January 1, 2013. (*See* Appendix A, attached).

The first page of the Commission's form, titled "Natural Gas Distribution Company Statement of Taxable Property," provided, in pertinent part:

PURPOSE: This information will be utilized by the assessor in determining the market value of the [taxpayer's] property in the county as of January 1 of the current year.

WHO MUST FILE: Any person, company or corporation that owns, controls or manages a gas distribution company must complete and file these schedules.

REPORTING PERIOD: All property owned, used or leased by the [taxpayer] on the first day of January in each year.

TYPE OF COSTS: The [taxpayer] *must file the original or historical costs* as found in Annual Report of Natural Gas Companies to the Public Service Commission of the State of Missouri and/or the Federal Energy Regulatory Commission (FERC) Form No. 2, Annual Report of Major Natural Gas Companies.

DEPRECIATION/OBSOLESCENCE: It is *recommended depreciation assignment follow the IRS guidelines found within IRS Publication 946.* However, determination of value is the responsibility of the county assessor.

(Emphasis added.) The bottom of the first page of the form provided that "[a] separate real estate and personal property reporting form must be prepared for each taxing entity within a county to correctly allocate the market value." The second and third pages of the form were the referenced reporting forms, respectively, for real property and tangible personal property.

The second page of the form required natural gas distribution companies to itemize the "original cost" of real property in service as of January 1, 2013. (*See* Appendix A). The original costs were to be subdivided in three vertical columns by asset type (367 Mains, 376 Mains, and 380 Services), and in eighteen horizontal lines representing the "year placed in service," beginning with 2012, and continuing through a line for 1996 and earlier. A fourth vertical column, labeled "Yearly Total," represented the sum of the original cost of the three asset types itemized in vertical columns one through three, with a "Yearly Total" calculated in each of the eighteen "year placed in service" lines. In the fifth vertical column, the form set forth a percentage to be multiplied by the "Yearly Total" in each "year placed in service" line, with the percentages declining from 100% for property placed in service in 2012, to 20% for property placed in service in 1996 and earlier. These percentages represented depreciation by describing the percentage of the original cost/"Yearly Total" that would be subject to taxation, and tracked the percentages recommended by IRS Publication 946. The final vertical column on the second page of the form was labeled "Market Value," and reflected the product of the "Yearly Total" in each "year placed in service" line multiplied by the designat-

ed depreciation percentage for that year. The sum of the "Market Values" was to be reflected on the bottom of the form as the "Total Value." The "Assessed Value" was then calculated by multiplying the "Total Value" by the statutorily required percentage of thirty-two percent.[2] Section 137.115.5(3).

The third page of the form required natural gas distribution companies to itemize the "original cost" of tangible personal property in service as of January 1, 2013. (*See* Appendix A). The third page of the form was identical in every respect to the second page of the form, except that vertical columns one through three identified personal property asset types instead of real property asset types.[3]

Along with the 2013 form, the Commission provided an Assessor's Manual to afford guidance to county assessors. Section 7.4 of the Assessor's Manual addressed the "Assessment of Natural Gas Local Distribution Companies," and provided in pertinent part that:

Natural gas local distribution companies are companies serving intrastate customers, namely residential and commercial/industrial customers. At this time, these companies are locally assessed. Originally, these companies were primarily located within the boundaries of one county. However, due to system expansions and company mergers, many companies now cross county and state boundaries. The companies supplying gas to the distribution companies (known as transmission companies) are typically interstate in nature. Some also supply industrial customers. These companies are centrally assessed by the State Tax Commission.

***All companies rely on original costs as a starting point. It is important for the assessor to arrive at a reasonable level of depreciation.***

[L.F. 1817][4] (Emphasis added.)

The form promulgated by the Commission for use by natural gas distribution companies in 2013 was apparently different from reporting forms used in previous years.[5] The 2013 form was not made available to taxpayers or county assessors until early in 2013. It is uncontested that the 2013 form and the related portions of the

---

**2.** Section 4(a) of Article X of the Missouri Constitution classifies taxable property into three categories: "class 1, real property; class 2, tangible personal property; class 3, intangible personal property." Section 4(b) of Article X of the Missouri Constitution provides that "[p]roperty in classes 1 and 2 and subclasses of those classes, shall be assessed for tax purposes at its value or such percentage of its value as may be fixed by law for each class and for each subclass.... Property in class 1 shall be subclassified in the following classifications: ... (3) Utility, industrial, commercial, railroad, and all other property not included in subclasses (1) and (2) of class 1." Pursuant to this constitutional authority, the General Assembly has determined that real property in subclass (3) shall be assessed at thirty-two percent of its true value in money.

**3.** The calculation of "Assessed Value" on the tangible personal property page of the form

required multiplying the "Total Value" by thirty-three and one-third percent of its true value in money. Section 137.115.1.

**4.** Though the applicable page from the Assessor's Manual admitted into evidence refers to a revision date in February 2015, the parties agreed that the pertinent language from the Assessor's Manual was in force in 2013.

**5.** Although it is uncontested that the 2013 form was different from previous years' reporting forms, earlier reporting forms were not made a part of the record before the Commission. Based on testimony before the Commission, and as we discuss in note 8, *infra*, it appears that where the 2013 form expressly required a reduction from reported original costs for depreciation, earlier forms did not.

Assessor's Manual required use of a "cost approach" valuation methodology based on original or historical costs.

As a natural gas distribution company with real and tangible personal property in 25 counties, Ameren was required to use the Commission's 2013 form. However, Ameren's FERC Form No. 2, from which the Commission's form required original cost information to be drawn, did not subdivide original costs by county at all, let alone by the asset types identified in vertical columns one through three of the second and third pages of the form. To prepare its reporting forms, Ameren began with the original cost of its entire natural gas pipeline system as of January 1, 2012 as had been previously reported to all 25 county assessors, added the original cost of all additions to the system in 2012, subtracted the original cost of all assets retired from the system in 2012, and then allocated the balance (the original cost of the system in service as of January 1, 2013), to taxing units within each county,[6] based on miles of pipeline in service in each taxing unit.[7] Ameren then prepared a real property and tangible personal property reporting form for each taxing unit within each county. Ameren's form roughly

approximated the second and third pages of the Commission's form, except that Ameren provided a "Yearly Total" (the original costs) of assets in service as of January 1, 2013 for each "year placed in service," (the subject of vertical column four on the second and third pages of the Commission's form) without subdividing that "Yearly Total" into asset types (the subject of vertical columns one through three on the second and third pages of the Commission's form). Consistent with the Commission's form, Ameren's reporting form then multiplied the "Yearly Total" in each "year placed in service" line by the corresponding depreciation percentage shown on the Commission's form to calculate a "Market Value" for each "year placed in service." The sum of the "Market Values" yielded a "Total Value," as contemplated by the 2013 form, with that number multiplied by the appropriate statutory percentage to achieve an "Assessed Value." Ameren filed its reporting forms by April 1, 2013.

Several county assessors expressed concern about the "Total Values" and resulting "Assessed Values" Ameren calculated for its real property and tangible personal property in service as of January 1, 2013.[8]

6. Because each taxing unit within a county has its own taxes or assessments it is authorized to collect, Ameren was required to file separate reporting forms for each taxing unit in each county.

7. The Commission's Decision and Order found that Ameren allocates the original cost of its pipeline system to counties "based upon the numbers of customers within the county." [L.F. 15] We do not find any support for that conclusion in the record, which includes the pre-filed direct testimony of several Ameren witnesses responsible for preparing Ameren's county tax reporting forms. Regardless, the allocation of original costs of the pipeline system among the 25 counties where the pipeline is located was not referred to in any manner as a point of contention in Commission hearing, and is not referred to in any

manner as a point of contention in this appeal. We note the discrepancy between our review of the record as a whole and the Commission's statement simply to explain our statement that the allocation amongst taxing units was based on miles of pipeline in service in each taxing unit.

8. Although the reporting form used before 2013 is not in the record, we are otherwise able to determine from the record that the 2013 form promulgated by the Commission resulted in a significant decrease in the "Assessed Values" proposed by Ameren as compared to 2012. It appears the only material difference between 2013 and earlier reporting years was that the Commission's 2013 form required original costs ("Yearly Totals") to be reduced by depreciation before calculating "Market Value." Thus, in Cole County, for

Some of the county assessors met with Ameren and expressed the belief that Ameren's "original costs" (which yielded the "Yearly Total" in each "year placed in service" line on Ameren's reporting form) already factored in depreciation, such that multiplying the "Yearly Totals" by the depreciation percentages shown on the Commission's form had resulted in double depreciation. Ameren assured the county assessors that no depreciation was reflected in its original cost ("Yearly Total") numbers. Notwithstanding this explanation, of the 25 counties in which Ameren filed reporting forms, 16 county assessors rejected Ameren's calculated "Market Values" and resulting "Assessed Values." The assessors in these 16 counties ascribed "Market Values" for Ameren's real property and/or tangible personal property that were very close, if not identical, to Ameren's reported "Yearly Totals." [L.F. 3268] In other words, the county assessors who challenged Ameren's valuations ascribed "Market Values" that roughly approximated Ameren's reported original costs/"Yearly Totals" without taking any reduction for depreciation.[9]

Specific to Cole County, Ameren reported the "Yearly Total" (original cost) of its real property in service in Cole County as of January 1, 2013 as $53,252,364. After multiplying the components of the "Yearly Total" by the depreciation percentages designated on the Commission's form for each "year placed in service," Ameren reported a "Market Value" in each "year placed in service" line, the sum of which produced a "Total Value" of $20,498,505. This "Total Value" was multiplied by the statutory assessment rate of thirty-two percent, to achieve an "Assessed Value" for real property in service in Cole County as of January 1, 2013 in the amount of $6,559,522.

example, Ameren's 2012 real property "Assessed Value" (its reported original costs of $52,504,707 multiplied by the statutory assessment rate of thirty-two percent) was **$16,801,510**. See [L.F. 3240, 3247] In contrast, as we explain, *infra*, use of the Commission's 2013 form resulted in Ameren calculating an "Assessed Value" for its real property in Cole County as of January 1, 2013 in the amount of **$6,559,522** (its reported original costs of $53,252,364, *multiplied by the depreciation factors specified on the Commission's form,* and then multiplied by the statutory assessment rate of thirty-two percent). The original costs reported by Ameren in 2012 and 2013 are not materially different. The only apparent difference in the two years appears to be the required reduction of original costs by a depreciation factor to determine the "Market Values" from which the "Assessed Value" was calculated. The same impact was felt in all 25 counties where Ameren was required to file reporting forms. See [L.F. 3240], reflecting Ameren's reported original costs for real and personal property as of January 1, 2012, and the corresponding "assessment by local assessor," in the 25 counties where Ameren's natural gas distribution pipeline is located, and compare same with [L.F. 3268], reflecting Ameren's reported original costs and determined "Market Values" for real and personal property as of January 1, 2013, and the assessors' determined "Market Values," in the 16 counties involved in Ameren's appeal to the Commission.

**9.** *See* [L.F. 3268], which summarizes the "Total Values" and post-depreciation "Market Values" calculated as of January 1, 2013 by Ameren for real property and tangible personal property in each of the 16 counties that challenged Ameren's reported values, and the "Market Values" actually set by the assessors and sustained by the boards of equalization in these counties. Thirteen counties challenged Ameren's reported real and tangible personal property "Assessed Values." (Callaway, Cape Girardeau, Cooper, Howard, Lincoln, Moniteau, Montgomery, Pike, Ralls, Randolph, Scott, Stoddard, and Warren). Two counties challenged only Ameren's reported real property "Assessed Values." (Butler and Cole). One county challenged only Ameren's reported real property "Assessed Values," but had collapsed the reported real property and tangible personal property original costs into one valuation. (Bollinger).

The Assessor did not accept Ameren's "Total [Market] Value" for real property, and instead assigned a "Market Value" to Ameren's real property in service in Cole County as of January 1, 2013 in the amount of $53,252,400, effectively adopting Ameren's **pre-depreciation**, original cost ("Yearly Total") amount.[10] The Assessor multiplied the assigned "Market Value" by the statutory assessment rate of thirty-two percent to yield an "Assessed Value" of $17,040,760, an amount that was $10,481,238 more than the "Assessed Value" Ameren calculated. The difference in the "Assessed Values" is exclusively attributable to depreciation which was factored into Ameren's valuation, but which was not factored into the Assessor's valuation.[11]

Ameren appealed the Assessor's determination to the Cole County Board of Equalization ("BOE"). Ameren identified as the basis for its appeal that "[d]epreciation per MO State Tax Commission guidelines not allowed by assessor in determining the appraised value of the real and/or personal [property] components of the Commercial Local Gas Distribution System." On July 28, 2013, the BOE summarily sustained the Assessor's valuation.

Ameren appealed the BOE's decision to the Commission. The Commission's appeal form requires a taxpayer to set forth the "True Value (Market)" and "Assessed Value" set by both the assessor and the board of equalization, and to set forth the taxpayer's proposed "True Value (Market)" and "Assessed Value." The appeal form then requires the taxpayer to identify the basis for the appeal.

Ameren's Cole County appeal form reported the "True Value (Market)" and "Assessed Value" set by the Assessor and sustained by the BOE, and the "True Value (Market)" and "Assessed Value" that had been proposed by Ameren's reporting forms. In addition, as required by the appeal form, Ameren identified the basis for its appeal as follows:

Ameren filed identical appeals with the Commission from the boards of equalization decisions sustaining county assessor valuations in the 15 other counties where assessors had not accepted Ameren's valuations. Ameren asserted the same basis for appeal in each appeal: that "[d]epreciation per MO State Tax Commission guidelines not allowed by assessor in determining market value of Local Gas Distribution System."

10. The $36 difference between the Assessor's "Market Value" number and Ameren's "Total [Market] Value" number is not explained by the record, but is immaterial to our discussion.

11. Though the Assessor did not accept Ameren's real property "Assessed Value," it did accept Ameren's tangible personal property "Assessed Value," and thus afforded Ameren credit for depreciation pursuant to the percentages set forth on page three of the Commission's 2013 form. [L.F. 3268]

Ameren's appeals were consolidated by the Commission. The 16 county assessors involved in the consolidated appeals were represented by the same attorney, and offered collective evidence to defend the appeals.

During the evidentiary hearing before the Commission, Ameren reiterated the basis for its appeals:

> Ameren [ ] is here challenging the market valuation and subsequent assessment of its natural gas distribution system *as the counties that are here subject of this hearing and appeal failed to allow Ameren [ ] a deduction for depreciation in determining the market value of its natural gas distribution system.* Ameren has appealed the valuations in 16 counties for real property components and 13 counties for the personal property components of the natural gas distribution system.

[L.F. 56] (Emphasis added.) The county assessors conceded during the hearing: that each had reacted to Ameren's 2013 reporting forms believing something was wrong;[12] that each had believed that Ameren's original costs/"Yearly Totals" already included depreciation; and that each now admitted this "was an incorrect conclusion." [L.F. 89]

In fact, the uncontested evidence submitted during the Commission hearing confirmed that Ameren's original cost numbers ("Yearly Totals") did *not* already reflect a depreciation deduction. And the uncontested evidence submitted during the Commission hearing confirmed that the assessors effectively adopted Ameren's original costs/"Yearly Totals" (or amounts very close thereto) as the proper "Market Value" without calculating a deduction for depreciation.

Though the assessors conceded the stated basis for Ameren's appeals to the Commission, the assessors nonetheless argued that their failure to calculate depreciation was irrelevant. The assessors argued that even though the assessors had not calculated *any* depreciation, Ameren could not establish that the "Market Value" set by each assessor was unlawful or unfair.

The county assessors offered expert testimony from George Sansoucy ("Mr. Sansoucy"), an appraiser.[13] Mr. Sansoucy offered his own opinion about the value of Ameren's taxable real property and tangible personal property. Mr. Sansoucy used a *different* valuation methodology from that required by the Commission's 2013 form and Assessor's Manual.[14] Instead of calculating "Market Value" by reducing original costs by depreciation, Mr. Sansoucy calculated "Market Value" by reducing "reproduction costs new" by depreciation. "Reproduction costs new" represented Mr. Sansoucy's calculation of the cost of Ameren's pipeline property in today's dollars,

---

12. *See* note 8, supra.

13. The Commission's procedural rules require direct examination testimony to be pre-filed. The assessors pre-filed Mr. Sansoucy's direct testimony and related exhibits accordingly. Ameren objected to the admission of Mr. Sansoucy's direct testimony and related exhibits, arguing the testimony and exhibits were not relevant to the specific issue being raised by Ameren on appeal. The Commission permitted Mr. Sansoucy's direct testimony to be admitted into evidence over Ameren's objection.

14. In addition, Mr. Sansoucy was commissioned by the county assessors to create a "suggested mass appraisal model for the going-forward value of natural gas distribution facilities throughout the various counties." [L.F. 87] That "suggested mass appraisal model" was not the basis for Mr. Sansoucy's valuation opinion related to Ameren's 2013 tax assessments, and is thus irrelevant to this appeal.

starting with Ameren's reported original costs "trended to present day." [L.F. 1160] Mr. Sansoucy's depreciation deduction did not rely on "life of asset" IRS depreciation percentages as the Commission's form recommended, but instead used a "breakdown method, which seeks to study, analyze, and calculate the different—the three primary forms of depreciation, physical, functional, and economic, for the cost approach." [L.F. 85] In fact, Mr. Sansoucy criticized the use of "life of asset" depreciation for real property, and the use of original costs to calculate market values, effectively criticizing the valuation methodology required by the Commission's 2013 form.[15] [L.F. 1160]

The "reproduction costs new" that Mr. Sansoucy calculated happened to be roughly double Ameren's reported original costs/"Yearly Totals," and thus roughly double the assessors' assigned "Market Values." After reducing "reproduction costs new" by depreciation calculated in the manner Mr. Sansoucy recommended, Mr. Sansoucy arrived at "Market Values" for Ameren's real property and tangible personal property in service as of January 1, 3013 that approximated the "Market Values" assigned by each assessor. [Exhibits 9 and 10; L.F. 1169-1170] Mr. Sansoucy acknowledged on cross-examination that his "reproduction costs new" valuation methodology had not been used by any of the county assessors, and was not consistent with the valuation methodology required by the Commission's 2013 form. Mr. Sansoucy also acknowledged that Amer-

en's reported "Yearly Totals" did not include depreciation, and that the assessors had not considered depreciation when assigning "Market Values," though they should have.

At the conclusion of the hearing before the Commission, the assessors argued that the issue before the Commission was not whether they had incorrectly calculated "Market Values" by failing to consider depreciation, but was instead a "de novo hearing to find a true value in money." [L.F. 88] The assessors argued that "the concluded value [for Ameren's taxable property in each of the counties involved in the appeal] *should be exactly as Mr. Sansoucy has reported in his appraisal*, and [that] the allocation to the various [taxing] units that are here under appeal are ... on Exhibit[ ] 9 and Exhibit [10]." [L.F. 88-89] (Emphasis added.) The assessors thus urged the Commission to adopt Mr. Sansoucy's "replacement costs new" valuation methodology, and to adopt Mr. Sansoucy's valuations calculated using that valuation methodology.[16]

The Commission entered its Decision and Order on October 20, 2015. The Commission did not adopt Mr. Sansoucy's "replacement costs new" valuation methodology, and did not adopt Mr. Sansoucy's valuation amounts. Instead, the Commission ordered that "[t]he assessed valuations for the subject properties as determined by the Assessors and sustained by

---

15. In the process, Mr. Sansoucy also effectively criticized the manner in which the market value of Ameren's property had been determined in the years preceding 2013, as the assessors' counsel confirmed during oral argument that prior to 2013, the assessed value of Ameren's real property had always been determined based on original costs.

16. During oral argument, the assessors' counsel confirmed that the assessors' position dur-

ing the hearing before the Commission was based on an overall disagreement with the Commission's 2013 form, and thus with the valuation methodology required by that form—a cost approach based on original costs. The assessors nonetheless conceded during oral argument that prior years' assessments of Ameren's real property had always been based on original costs.

the Boards of Equalization are AFFIRMED." [L.F. 25]

■ Ameren sought judicial review of the Commission's Decision and Order pursuant to section 138.470(4) and sections 536.100 to 536.140.[17] Because section 138.470(4) directs that "the venue of proceedings for review involving the assessment of real property is the county where the real property is situated," Ameren's

17. Ameren's appeal to the Commission was heard by a hearing officer. [L.F. 53-89, Transcript of Hearing Proceedings] Section 138.431.1, .2, and .3 provide that to hear appeals from a board of equalization pursuant to section 138.430, the Commission "shall appoint one or more hearing officers," and "may assign such appeals as it deems fit to a hearing officer for disposition," or "may, in its discretion, reserve such appeals as it deems fit to be heard and decided by the full commission, a quorum thereof, or any commissioner ... and, in such case, the decision shall be final, subject to judicial review in the manner provided in subsection 4 of section 138.470." If an appeal is assigned to a hearing officer, section 138.431.5 provides that "[a]ppeals from decisions of hearing officers *shall be made pursuant to section 138.432.*" (Emphasis added.)

Pursuant to section 138.432, a taxpayer has a right to file an application for review with the Commission to seek review of a hearing officer's decision and order, which application for review can be summarily allowed or denied by the Commission. If an application for review from a hearing officer's decision and order is allowed, the Commission "may affirm, modify, reverse, or set aside the decision and order of the hearing officer on the basis of the evidence previously submitted in such case, may take additional evidence, or may remand the matter to the hearing officer with directions." Section 138.432. And section 138.432 provides that once application for review from the decision of a hearing officer is filed with the commission: "the commission shall promptly notify the parties of its decision and order ... [which] shall be subject to judicial review in the manner provided by subsection 4 of section 138.470. If an application for review is denied, the decision and order of the hearing officer shall be deemed to be the final decision of the commission for purpose of judicial review and shall be subject to the judicial review within the time and manner provided for with respect to decisions of the commission pursuant to subsection 4 of section 138.470; except that, the time limitations shall run from the date of notice or mailing of the order of the commission denying the application for review."

Simplified, the resolution of an appeal to the Commission from a board of equalization decision pursuant to section 138.430 is not final for purposes of judicial review under section 138.470 until the Commission, in whole or in part, has ruled on the appeal, whether by some or all of the Commission's members hearing the appeal directly, or by the Commission taking action on an application for review from a decision and order entered by a hearing officer.

Here, Ameren did not file an application for review of the Decision and Order with the Commission, even though its appeal was heard by a hearing officer. [L.F. 14] However, though Ameren's appeal was heard by a hearing officer, the Decision and Order was not issued by the hearing officer. It was issued by three commissioners who did not hear the matter. [L.F. 26] Section 138.431 does not address whether an initial decision and order can be issued by the Commission or some of its members when the appeal has been assigned to (and the evidence heard by) a hearing officer. The record does not explain how or why the Decision and Order was signed by three commissioners, though the hearing was conducted before a hearing officer.

No one has raised the impact of this procedural irregularity, if any, on the Commission's authority to act in this case, or on the propriety of Ameren's appeal. However, because the Decision and Order was issued by the Commission and not by a hearing officer, we conclude that Ameren had no obligation to file an application for review with the Commission pursuant to section 138.432 in order to exhaust its administrative remedies. Instead, we conclude that the Decision and Order was a decision and order of the Commission. As such, pursuant to section 138.470.4, "[t]he action of the commission, or member or agent thereof, when done as provided in this section, shall be final, subject, however, to review in the manner provided in section 536.100 to 536.140...."

requests for judicial review were separately filed in the 16 counties involved in the consolidated appeals before the Commission.

On August 1, 2016, the Circuit Court of Cole County entered its Order, Decision and Judgment ("Judgment") affirming the Commission's Decision and Order.

Ameren filed this timely appeal.[18]

## Standard of Review

▮▮▮ "On an appeal from a judgment of a trial court addressing the decision of an administrative agency, we review the decision of the administrative agency and not the judgment of the trial court." *Rinehart v. Bateman*, 363 S.W.3d 357, 362-63 (Mo. App. W.D. 2012) (citing *Bird v. Mo. Bd. of Architects*, 259 S.W.3d 516, 520 n. 7 (Mo. banc 2008)). Thus, in this appeal, we review the Decision and Order of the Commission, and not the Judgment of the circuit court. *Snider v. Casino Aztar/Aztar Missouri Gaming Corp.*, 156 S.W.3d 341, 346 (Mo. banc 2005). "Notwithstanding, in our mandate, we reverse, affirm or otherwise act upon the judgment of the trial court." *Rinehart*, 363 S.W.3d at 363 (citing *Bird*, 259 S.W.3d at 520 n.7).

"Pursuant to Mo. Const. art. V, section 18 and section 536.14[ ], we must determine 'whether the [Commission's] findings are supported by competent and substantial evidence on the record as a whole; whether the [Decision and Order] is arbitrary, capricious, unreasonable or involves an abuse of discretion; or whether the [Decision and Order] is unauthorized by law.'" *Henry v. Mo. Dept. of Mental Health*, 351 S.W.3d 707, 712 (Mo. App. W.D. 2011) (quoting *Coffer v. Wasson–Hunt*, 281 S.W.3d 308, 310 (Mo. banc 2009)).

▮▮▮ To the extent the Decision and Order was based on the Commission's interpretation and application of the law, "we review the [Commission's] conclusions of law and its decision *de novo*, and we make corrections to erroneous interpretations of the law." *Rinehart*, 363 S.W.3d at 363 (citing *Algonquin Golf Club v. State Tax Commission*, 220 S.W.3d 415, 418 (Mo. App. E.D. 2007)). "Whether the appropriate standard of value and approach to valuation were properly applied under the particular facts and circumstances of the case is a question of law." *Snider*, 156 S.W.3d at 346 (citing *City of St. Louis v. Union Quarry & Construction Co.*, 394 S.W.2d 300, 303 (Mo. 1965)).

## Analysis

Ameren raises four points on appeal. Ameren alleges, respectively, that the Commission erred in affirming the Assessor and BOE's assessed valuation of Ameren's real property in service in Cole County as of January 1, 2013 because: (i) the Assessor improperly applied the cost approach in valuing Ameren's property by

---

**18.** Ameren initially appealed the consolidated matters to the Missouri Supreme Court, arguing jurisdiction was exclusive there as its appeals involved the construction of a revenue statute. The Supreme Court disagreed, and transferred the matters to the intermediate appellate districts, with each assuming jurisdiction over the appeals involving counties within their boundaries. The Eastern and Western Districts have stayed all but one appeal filed in their district. The Southern District has consolidated two appeals filed in its district. Oral argument is scheduled in the Eastern District appeal on October 5, 2017 (ED105477, *Ameren v. Assessor of Cape Girardeau County*). Oral argument is scheduled in the consolidated Southern District appeals on October 26, 2017 (SD34933, *Ameren v. Assessor of Bollinger County*; and SD34934, *Ameren v. Assessor of Butler County*). Though the amounts in dispute vary in these cases, the issues on appeal are not materially distinguishable.

failing to consider depreciation;. (ii) the Commission denied Ameren review as permitted by section 138.430 by relying on Mr. Sansoucy's valuation methodology to affirm the Assessor's valuation when Mr. Sansoucy's methodology was not used by the Assessor; (iii) the Commission erroneously concluded that Ameren did not present any evidence of market value; and (iv) the Commission presumed the correctness of the Assessor's valuation, though that presumption has been legislatively abolished, and thus held Ameren to an incorrect burden of proof. We address the first three points, collectively, before addressing point four.

## Points One, Two and Three

Section 138.430.1 addresses the permissible scope of a taxpayer's appeal to the Commission, and provides, in pertinent part, as follows:

> Every owner of real property or tangible personal property shall have the right to appeal from the local boards of equalization to the state tax commission under rules prescribed by the state tax commission ... *concerning all questions and disputes involving the assessment against such property, the correct valuation to be placed on such property, the method or formula used in determining the valuation of such property,* **or the** *assignment of a discriminatory assessment to such property.* The commission shall investigate all such appeals and shall correct any assessment or valuation which is shown to be unlawful, unfair, improper, arbitrary or capricious.

(Emphasis added.) The plain language of section 138.430.1 identifies four distinct grounds on which a taxpayer may rely to challenge an assessment or valuation. Consistent with the plain language of section 138.430.1, Ameren's appeal challenged only the "method or formula used in determining the valuation" of its property, and more specifically, that depreciation per Commission guidelines was not allowed by the assessors in determining "Market Value." Ameren thus did not challenge the Assessor's use of a cost approach valuation methodology based on original/historical costs, but instead challenged only that the Assessor applied this approach unlawfully by failing to consider depreciation.

▮▮▮▮ "There are several methods of determining the true value in money [19] of real estate[,] ... [including] capitalization of income; market data; cost of construction; [and] cost of replacement of improvements." *St. Louis County v. Security Bonhomme, Inc.*, 558 S.W.2d 655, 659 (Mo. banc 1977). "The method used depends on several variables inherent in the highest and best use of the property in question." *Aspenhof Corp. v. State Tax Com'n of Missouri*, 789 S.W.2d 867, 869 (Mo. App. E.D. 1990). "Each of these methods is made up of several factors or elements, each of which must be present and considered in applying the method of which they are a part." *Security Bonhomme, Inc.*, 558 S.W.2d at 659. *See also, Aspenhof Corp.*, 789 S.W.2d at 869 ("Each method as factors unique to the method, to consider in calculating the property's true value in money.").

▮▮▮▮ "The 'cost approach' may be based on either reproduction cost or replacement cost." *Snider*, 156 S.W.3d at 347 (citing *Security Bonhomme, Inc.*, 558

---

19. "The assessed valuation of property is its true value in money. True value in money is the fair market value of the property on the valuation date, [ ], and is a function of its highest and best use, which is the use of the property which will produce the greatest return in the reasonably near future. It is at best an estimate." *Aspenhof Corp. v. State Tax Com'n of Missouri*, 789 S.W.2d 867, 869 (Mo. App. E.D. 1990) (citations omitted).

S.W.2d at 659). "The reproduction cost, or cost of construction, is a determination of the cost of constructing an exact duplicate of an improved property using the same materials and construction standards." *Id.* The reproduction cost approach begins with the actual or original cost of the real property and/or its improvements. In contrast, "[t]he replacement cost [approach] uses an estimate of the cost of constructing a building with the same utility as the building being appraised but with modern materials and according to current standards, design and layout." *Snider*, 156 S.W.3d at 347 (citing *Aspenhof Corp.*, 789 S.W.2d at 869). Simplified, "reproduction cost" is based on the original or historical costs of construction, while "replacement cost" is based on the value in today's dollars to reconstruct an improvement. Regardless the cost approach utilized, " 'it is recognized that a proper deduction must be made for depreciation.' " *Stephen & Stephen Properties, Inc. v. State Tax Commission*, 499 S.W.2d 798, 803 (Mo. banc 1973) (quoting *State ex rel. State Highway Commission v. Cone*, 338 S.W.2d 22, 27 (Mo. 1960)).

 The form and Assessor's Manual promulgated by the Commission for use by all assessors in 2013 to assess the true value in money of real property and tangible personal property owned by natural gas distribution companies in service as of January 1, 2013 required use of the reproduction cost approach, as it was based on original, historical costs, reduced by depreciation. It was within the Commission's sound discretion to require use of the reproduction cost approach to determine the true value in money of natural gas pipeline real property and tangible

personal property. "The commission has some discretion in deciding which approach best estimates the value of a particular property." *Snider*, 156 S.W.3d at 348.

In fact, the Commission's 2013 decision to require assessors to use the reproduction cost approach to value natural gas pipeline property was consistent with section 137.122, at least with respect to tangible business personal property placed in service after January 1, 2006. Section 137.122 *requires* use of the reproduction cost approach, and provides, in pertinent part:

2. To establish uniformity in the assessment of depreciable tangible personal property, *each assessor shall use* the standardized schedule of depreciation in this section to determine the assessed valuation of depreciable tangible personal property for the purpose of estimating the value of such property subject to taxation under this chapter.

3. For purposes of this section, and to estimate the value of depreciable tangible personal property for mass appraisal purposes, *each assessor shall* value depreciable tangible personal property by applying the class life and recovery period to the original cost of the property according to the following depreciation schedule. The percentage shown for the first year shall be the percentage of the original cost used for January first of the year following the year of acquisition of the property, and the percentage shown for each succeeding year shall be the percentage of the original cost used for January first of the respective succeeding years as follows:

| Year | Recovery Period in Years | | | | |
|---|---|---|---|---|---|
| | 5 | 7 | 10 | 15 | 20 |

Depreciable tangible personal property in all recovery periods shall continue in subsequent years to have the depreciation factor listed in the appropriate column *so long as it is owned or held by the taxpayer*. The state tax commission shall study and analyze the values established by this method of assessment and in every odd-numbered year make recommendations to the joint committee on tax policy pertaining to any changes in this methodology, if any, that are warranted.

4. *Such estimate of value determined under this section shall be presumed to be correct for the purpose of determining the true value in money of the depreciable tangible personal property*, but such estimation may be disproved by substantial and persuasive evidence of the true value in money under any method determined by the state tax commission to be correct, including, but not limited to, an appraisal of the tangible personal property specifically utilizing generally accepted appraisal techniques, and contained in a narrative appraisal report in accordance with the Uniform Standards of Professional Appraisal Practice or by proof of economic or functional obsolescence or evidence of excessive physical deterioration. . . .

5. This section shall not apply to business personal property placed in service before January 2, 2006. . . .

(Emphasis added.)

Section 137.122.1(4) defines "Original Cost" as "the price the current owner, the taxpayer, paid for the item without freight, installation, or sales or use tax."

Section 137.122.1(5) defines "Placed in Service" as the point when property "is ready and available for a specific use." Section 137.122(6) defines "Recovery Period" as "the period over which the original cost of depreciable tangible personal property shall be depreciated for property tax purposes and *shall be the same as the recovery period allowed for such property under the Internal Revenue Code.*" (Emphasis added.)

Section 137.122 thus codifies the requirement that depreciation be considered when calculating market value based on original costs, at least with respect to tangible business personal property. *Stephen & Stephen Properties, Inc.*, 499 S.W.2d at 803 (" 'Whenever consideration is given to the cost of reproduction as an element in the determination of market value, it is recognized that a proper deduction must be made for depreciation.' ") (quoting *Cone*, 338 S.W.2d at 27). *See also, Snider*, 156 S.W.3d at 347 (noting that "assessor used the reproduction cost approach to determine the true value of ... property by taking the actual cost of acquiring and improving the property and decreasing that amount to account for ... depreciation and depletion").

The 2013 form promulgated by the Commission for use by natural gas distribution companies to report tangible personal property owned as of January 1, 2013 emulated the valuation methodology described in section 137.122. The 2013 form: (i) required reporting of the **original cost** of property based on the year **placed in service**; (ii) employed a **recovery period** of twenty (20) years; (iii) required the total original cost of property listed in each year placed in service to be multiplied by a depreciation percentage that tracked the percentages on the recovery chart shown in section 137.122 for a twenty (20) year recovery period; and (iv) directed the natural gas company taxpayer to assume that Internal Revenue Publication 946 would control the depreciation calculation. *Compare* Appendix A, page 3 to section 137.122.3.

Though section 137.122 does not address the valuation of real property, the Commission's 2013 form required assessors to use the same valuation methodology for both real property and tangible personal property owned by natural gas distribution companies. The Commission's decision was logically grounded. As reflected in the Commission's Assessor's Manual, "[r]ecent statutory changes state[ ] that real property is 'stationary property used for transportation of liquid and gaseous products, including ... natural gas.' " [L.F. 1817] (referring to section 137.010(4)). As such, the Commission found in its Decision and Order that "[p]roperty which is otherwise personal property[ ] can be treated as real property when it is attached to land or a building and is regarded as an irremovable part of the real property.... A pipeline may be considered a fixture as it may be regarded as an irremovable part of the real property." [L.F. 19-20] The Commission's decision to require use of the same valuation methodology for real property and tangible personal property owned by natural gas distribution companies simply recognized that the fixture components of a pipeline, though real property by statutory definition, are nonetheless components that would be tangible personal property but for incorporation into the pipeline.

Consistent with this observation, the Commission's Decision and Order addressed the Assessor's Manual, and found as to all 16 of Ameren's appeals—and thus as to all challenged tangible personal property and real property valuations—that:

The State Tax Commission provides supervision of assessing officers and as-

sessment practices in the state. In implementing its supervisory role, the Commission assists assessors in the performance of their duties including providing a manual. Included in the manual are *guidelines to assist the assessors' offices with the valuation of unique properties, including natural gas distribution companies.* The State Tax Commission has developed forms to assist the assessor in the gathering of data for assessment. *The data gathered may be used in a cost approach valuation. The cost approach may use original costs. 'Original cost' is defined in Section 137.122 RSMo as the price the current owner, the taxpayer, paid for the item without freight, installation, or sales or use tax. Once original cost is determined, depreciation based upon the life of the asset is calculated.* [L.F. 22] (Emphasis added.) The Commission's Decision and Order then found as to *all* of Ameren's appeals that "[Ameren] reported a cost figure to the county assessors," without freight, installation, sales or use tax (just as "original cost" is defined by section 137.122(4)). [L.F. 22]

Though the Commission found that Ameren reported "original costs" as required, it is uncontested—and in fact admitted by the assessors—that the assessors did not calculate depreciation upon the life of Ameren's assets as required by the Commission's 2013 form and Assessor's Manual. Despite this conceded failure, the Commission affirmed the assessors' valuations as sustained by the boards of equalization. In so doing, the Commission committed legal error. "Whether the appropriate standard of value and approach to valuation were properly applied under the particular facts and circumstances of the case is a question of law." *Snider,* 156 S.W.3d at 346. "Once the commission decides to use a particular [valua-

tion] approach, it must apply that approach properly and consider all of the factors relevant to that approach." *Id.* at 348. Here, the Commission acted within its discretion to require use of the reproduction cost valuation methodology, both when it promulgated the 2013 form and again when it affirmed the assessors' valuations which purported to employ that valuation methodology. However, the assessors applied the reproduction cost valuation methodology without recognizing *any* deduction for depreciation, even though " 'it is recognized that a proper deduction must be made for depreciation' " when employing the cost approach. *Stephen & Stephen Properties, Inc.,* 499 S.W.2d at 803 (quoting *Cone,* 338 S.W.2d at 27). "A tax assessment . . . will not be upheld where it is clear that the assessment does not take into account all factors relevant to a determination of 'true value in money.' " *Id.* at 802.

The Assessor argues that it is irrelevant that the assessors employed the reproduction cost approach without considering depreciation. The Assessor argues that once an appeal is taken to the Commission, the *only* issue the Commission is to determine is the true value in money of the subject property. The Assessor thus argues that it would be improper to isolate our discussion to whether the valuation methodology used by the assessors was properly applied, and insists that we should instead focus on whether the assessors' valuations, though improperly calculated, were nonetheless reflective of true value in money.

It is true that "[d]etermining the true value in money is an issue of fact for the Commission." *Aspenhof Corp.,* 789 S.W.2d at 869. However, it is also true that "[w]hether the appropriate standard of value and approach to valuation were properly applied under the particular facts and circumstances of [a] case is a question of

law." *Snider*, 156 S.W.3d at 346. Here, the Commission did not disregard the assessors' valuations to independently determine the true value in money of Ameren's property based on a valuation methodology that neither the assessors, the boards of equalization, nor Ameren had used.[20] Instead, the Commission affirmed the assessors' valuations as sustained by the boards of equalization, and in doing so, maintained its endorsement of the reproduction cost valuation methodology the 2013 form required, even though the record unequivocally establishes that the assessors applied the valuation methodology improperly. Since the assessors failed to consider all factors relevant (and required) to the proper application of the reproduction cost valuation methodology, the "Market Values" and resultant "Assessed Values" determined by the assessors (and affirmed by the Commission) are flawed and cannot be upheld as a matter of law. *Stephen & Stephen Properties, Inc.*, 499 S.W.2d at 802 ("A tax assessment ... will not be upheld where it is clear that the assessment does not take into account all factors relevant to a determination of 'true value in money.'").

■ This conclusion recognizes that pursuant to the plain language of section 138.340, an appeal to the Commission can be taken on one or more of four distinct grounds, including whether "the method or formula used [by the assessor and board of equalization] in determining the valuation" of property is erroneous. It is of course axiomatic that a challenge to the methodology or formula used by an assessor or board of equalization is necessarily a challenge to the valuation reached by that methodology or formula.[21] However, a challenge to the methodology or formula used by an assessor or board of equalization may take one of two forms. The challenge may *either* involve a claim that the wrong methodology or formula was used, *or* a claim that the proper methodology was used but improperly applied because all relevant factors were not considered. The first scenario was at issue, for example, in *Quincy Soybean Co., Inc. v. Lowe*, 773 S.W.2d 503, 504-05 (Mo. App. E.D. 1989), where the assessor used "replacement cost less depreciation" in determining the true value in money, but the taxpayer argued for a different, nontraditional, methodology. The second scenario was at issue, for example, in *Stephen & Stephen Properties, Inc.* 499 S.W.2d at 802-03, where the taxpayer agreed with the assessor's use of the reproduction cost valuation methodology, but argued that the assessor failed to take into account all relevant undisputed factors which have a depreciating effect on the property's true value in money.

Ameren's appeals to the Commission fell squarely into the second category of possible challenges to methodology. Ameren did not contest the assessor's use of a re-

---

**20.** Ameren takes the position that the Commission could not have done so, as a matter of law. We need not address the Commission's authority to determine true value in money based on a valuation methodology that neither the assessor, the board of equalization, nor the taxpayer used to determine the proposed valuations giving rise to an appeal to the Commission.

**21.** As such, it is disingenuous for the Assessor to argue, as he does in his Brief, that "[a]n alleged error in appraisal methodology is ir-

relevant unless the alleged error results in a failure to find true value in money." [Respondent's Brief, p. 12] Though in theory it is true that harmless error will not support relief, the assessors' improper application of an otherwise proper valuation methodology necessarily had an adverse effect on Ameren, as the failure to apply *any* depreciation adjustment necessarily resulted in a materially higher assessment. This is not a case of "harmless error."

production cost valuation methodology based on original costs—and in fact Ameren's reporting forms used the same valuation methodology. Instead, just as was the case in *Stephen & Stephen Properties, Inc.*, Ameren contested the assessors' failure to consider depreciation—a relevant and required factor in the determination of market value based on a cost approach. 499 S.W.2d at 802-03. As a result, the issue squarely before us in this appeal is a question of law: whether the assessors' valuations, which were affirmed by the Commission, were the result of an improper application of an otherwise proper valuation methodology. As we have explained, the answer to that question is yes.

Undeterred, the Assessor argues that Ameren did not meet its burden to prove true value in money of its real property. This argument relies heavily on the following findings in the Commission's Decision and Order: (i) that Ameren "did not present *any* market evidence" *because* Ameren did not "provid[e] an appraisal . . . or any testimony regarding an appraisal that has been completed;" [L.F. 21] (ii) that "without presenting an opinion of market value and substantial and persuasive evidence that the proposed value is indicative of the market value of the subject property on January 1, 2013, [Ameren] fails to meet their burden of proof;" [L.F. 21] and (iii) that "[Ameren] failed to meet their burden of proof in that they failed to present evidence that their assessments were unlawful, unfair and improper and failed [to] present any evidence of the market value of their property on January 1, 2013." [L.F. 25] (Emphasis added.) These findings are arbitrary and capricious, are not supported by competent and substantial evidence on the record as a whole, and are legally erroneous.

■ First, there is no authority for the proposition that evidence of market value

or true value in money must be in the form of an appraisal. To the contrary, Missouri courts have often held that a property owner is competent to express an opinion as to the value of his own property. *See, e.g., Esmar v. Zurich Ins. Co.*, 485 S.W.2d 417, 424 (Mo. 1972) ("The owner . . . is qualified to give his opinion as to the value of his own property, even though he was not a real estate expert."). The Commission's conclusion that Ameren presented no evidence of market value because it did not submit an appraisal is legally erroneous.

■ Second, the Commission's conclusion that Ameren presented no evidence of market value is arbitrary and capricious, an abuse of discretion, and is not supported by the record as a whole. Ameren introduced into evidence the reporting forms it filed with each assessor—forms that set forth the original cost/"Yearly Total" of its real property and tangible personal property for each "year placed in service," and then multiplied the "Yearly Totals" by the depreciation factor specified by the Commission to achieve *what the Commission's form itself characterized as the "Market Value"* for each "year placed in service." Ameren's witnesses meticulously explained the methods used to calculate original costs—the bedrock data from which subsequent entries on the reporting forms (including depreciation) were simple mathematical calculations. The assessors effectively adopted Ameren's original cost calculations as their own, assigning amounts identical or very close to Ameren's "Yearly Totals" as the assessors' "Market Values" against which the statutory assessment rates were applied. [L.F. 3268] Even Mr. Sansoucy, the assessors' expert witness, used Ameren's original cost/"Yearly Totals" as a starting point for his alternative "reproduction costs new" valuation methodology. It is plainly

not the case that Ameren presented no evidence of market value.

■ Even though the assessors and the assessors' expert accepted Ameren's original cost calculations to reach their own conclusions about "Market Value," the Assessor now questions Ameren's original cost data, relying on the following finding in the Decision and Order:

> [Ameren] reported a cost figure to the county assessors. [Ameren's] "original cost" figures took the cost new and removed the freight, installation and labor." [Ameren] later made an additional downward adjustment in an amount of the original cost of the retiring depreciated asset it was replacing. There is no appraisal authority for making this adjustment. Since the retiring asset is no longer declared as property for property tax purposes, [Ameren] is no longer being taxed on that property. Crediting the original cost of the replaced asset against the new asset does not establish market value, is not recognized appraisal practice, and is not logical.

[L.F. 22-23] The Commission's finding is arbitrary and capricious, an abuse of discretion, is not supported by competent and substantial evidence on the record as a whole, and is legally erroneous. As the Commission's Decision and Order correctly observed, Ameren *cannot be taxed on assets that are not in service in its pipeline system as of January 1, 2013*. Subtracting the original cost of assets that were a part of Ameren's pipeline as of January 1, 2012, but that were removed from the pipeline before January 1, 2013, is the *only* way to ensure that Ameren was not taxed for assets that were not in service as of January 1, 2013. Subtracting the original cost of assets retired from service between January 1, 2012 and January 1, 2013 is not an "appraisal practice" that required "appraisal authority." Rather, it

is a simple math problem. Ameren's reporting forms plainly show that retired assets were properly subtracted at their original cost in the "year placed in service" line that corresponded to the year the retired asset was originally placed in service. [*See, e.g.,* L.F. 3248-3259, Ameren's reporting forms for the taxing units in Cole County] This generated a net original cost in each "year placed in service" that remained subject to the depreciation factor applicable to that "year placed in service." Ameren's calculation of the original costs of assets actually in service as of January 1, 2013 is neither illogical nor an unsupportable appraisal practice.

■ The Assessor also attempts to discredit Ameren's original cost data by complaining that Ameren used a reporting form that was not identical to the Commission's 2013 form. The Commission's Decision and Order attached no significance to this fact, and neither do we. The only meaningful difference between the Commission's 2013 form and Ameren's self-generated reporting form was that Ameren's form did not subdivide its "Yearly Totals" for real property or tangible personal property into the three asset types identified in vertical columns one through three on the second and third pages of the Commission's form. Ameren explained that the information on its FERC Form No. 2 did not subdivide the original cost of these asset types by county. The Assessor does not explain why or how Ameren's reporting of "Yearly Totals" without the requested subdivision of those sums into asset types made any difference to the assessors—all of whom effectively adopted Ameren's "Yearly Totals" to approximate the "Market Values" each assigned.

■ Finally, the Assessor argues that because the assessors' expert witness calculated a true value in money that came very close to the valuation determined by

each of the assessors, than the assessors' admittedly erroneous application of the reproduction cost valuation methodology should be disregarded. The Assessor's "no harm no foul" argument is not supported by any authority, and disregards clear authority to the contrary. "Once the commission decides to use a particular [valuation] approach, it must apply that approach properly and consider all of the factors relevant to that approach." *Snider*, 156 S.W.3d at 348. "A tax assessment ... will not be upheld where it is clear that the assessment does not take into account all factors relevant to a determination of 'true value in money.'" *Stephen & Stephen Properties, Inc.*, 499 S.W.2d at 802.

An argument similar to that raised by the Assessor was raised and rejected in *State ex rel. Kahler v. State Tax Commission*, 393 S.W.2d 460 (Mo. 1965). There, a taxpayer alleged, and the evidence established, that the assessor employed a discriminatory assessment process to value the taxpayer's property that did not treat other property of the same class in the same manner, one of the four available grounds for an appeal pursuant to section 138.430.1. *Id.* Our Supreme Court rejected the argument that a taxpayer had no basis to complain so long as the assessor's valuation was otherwise demonstrated to be an approximation of true value in money, noting that to hold otherwise would be to marginalize the prohibition against discriminatory assessment practices. *Id.* at 465. The Supreme Court's holding in *State ex rel. Kahler* is of analogous application here. The assessors' admitted error in applying an otherwise proper valuation methodology cannot be remediated because some other valuation methodology that was not employed by the assessors might

have produced a similar valuation. That is especially true in this case, as the Commission did not adopt the assessors' expert's valuation methodology or valuation amounts, even though the assessors asked the Commission to do so at the conclusion of the hearing. *See, e.g., Drey v. State Tax Commission*, 345 S.W.2d 228, 234-35 (Mo. 1961) (holding that commission order affirming assessor's assessment, despite fact that assessor "wholly ignored" depletion in value as a factor in determining assessed value, could not be affirmed on appeal based on alternative expert evidence given "assessor's unaccounted for and unsupported failure to give weight to the fact of ... extensive depletion").

Although the Commission did not adopt Mr. Sansoucy's valuation methodology or valuations, it is true that the Decision and Order referred to Mr. Sansoucy's determined values to bolster the Commission's decision to affirm the assessors' valuations as sustained by the boards of equalization. Specifically, the Commission's Decision and Order noted that Mr. Sansoucy's determined values "support the Boards' [of Equalization] presumed correct valuation,"[22] presumably because they were very close to the "Market Values" assigned by the assessors. [L.F. 24] However, we have already explained that when the Commission adopts a valuation methodology and fails to consider all factors required or relevant to that methodology, the resulting calculation of true value in money is unlawful, unfair, and improper as a matter of law. *Stephen & Stephen Properties, Inc.*, 499 S.W.2d at 802. And we have already explained that a "no harm no foul" contention carries no weight in remediating legal error that results when a valuation methodology adopted by the Commis-

---

**22.** Whether a board of equalization valuation is presumptively correct is the subject of Am-

eren's fourth point on appeal, discussed *infra*.

sion has not been properly applied. *Id.*; *State ex rel. Kahler*, 393 S.W.2d at 465; *Drey*, 345 S.W.2d at 234-35.

In addition, the Commission's reference to Mr. Sansoucy's valuations to bolster its affirmation of the assessors' valuations suffers an inseparable connection to the Commission's erroneous conclusion, discussed *supra*, that Ameren failed to "meet [its] burden of proof in that [it] failed to present evidence that [its] assessments were unlawful, unfair and improper." [L.F. 25] Ameren plainly did sustain its burden to negate the presumption of correctness, if any, attached to the assessors' valuations as sustained by the boards' of equalization when Ameren established (and the assessors admitted) that the reproduction cost approach methodology the assessors employed was not properly applied given the assessors' failure to consider depreciation.[23]

Thus, the assessors' valuations are in no way supported or bolstered by Mr. Sansoucy's testimony. In fact, the assessors'

valuations were anathema to Mr. Sansoucy. Mr. Sansoucy was critical of the valuation methodology used by the assessors and required by the Commission's 2013 form and Assessor's Manual. [L.F. 1160] Mr. Sansoucy used a fundamentally different valuation methodology than the assessors used (replacement costs new versus reproduction costs based on original costs). Mr. Sansoucy criticized reliance on original costs to determine true value in money. Mr. Sansoucy applied depreciation to his cost approach valuations where the assessors admittedly failed to do so. And Mr. Sansoucy testified that it was erroneous for the assessors to ignore depreciation in their cost approach valuations. While the "end result" of Mr. Sansoucy's valuations were coincidentally similar to the assessors' valuations, Mr. Sansoucy's testimony can in no way be read to support or bolster the assessors' valuations. Demonstrative of this point is the fact that *even though urged by the assessors to do so*, the Commission did not adopt Mr. Sansoucy's valuation methodology,[24] nor his valuations.[25]

23. The assessors argued throughout the hearing that they had no burden to put on any evidence of value. The Commission endorsed this position, finding in its Decision and Order when referring to Mr. Sansoucy's valuations that "[a]lthough the [assessors] had no burden in this appeal, their evidence supports the [boards' of equalization] presumed correct valuation." [L.F. 24] It was erroneous for the Commission to conclude that the assessors had no burden to put on evidence of value. Once Ameren established, and the assessors admitted, that the reproduction cost valuation methodology they employed had been unlawfully and unfairly applied, there remained no evidence upon which the Commission could have relied to affirm the assessors' valuations. It was in this context that the assessors necessarily tendered Mr. Sansoucy's appraisal and valuation opinion—not to encourage the Commission to affirm the assessors' valuations, but to instead urge the Commission to adopt an alternative valuation methodology that differed materially from the methodology required by the Commission's 2013 form. In

fact, the assessors argued during the hearing that the valuation methodology Ameren used (original costs less life of asset depreciation to determine market value) was unconstitutionally discriminatory, a challenge directed at Ameren, but necessarily an indictment of the Commission itself, as it was the Commission which promulgated the 2013 form and Assessor's Manual requiring use of the reproduction cost valuation methodology. Though urged by the assessors to do so, the Commission did not adopt Mr. Sansoucy's alternative valuation methodology, and in the process, plainly disagreed with the assessors' contention that the reproduction cost valuation methodology was unconstitutionally discriminatory. The assessors did not seek judicial review of the Commission's decision in this regard, and have thus waived their claim that use of a reproduction cost valuation methodology is constitutionally discriminatory.

24. We recognize that "cost new," the essence of Mr. Sansoucy's valuation methodology, is essentially "replacement cost" in today's dol-

In summary, the Commission committed legal error when it affirmed the assessors' valuations as sustained by the boards of equalization. The Commission's 2013 form and Assessor's Manual required use of, and the assessors purported to use, a reproduction cost valuation methodology based on original costs. The Commission affirmed this valuation methodology as the proper methodology in its Decision and Order. Once the Commission decided, within its discretion, to require use of the reproduction cost valuation methodology to determine the true value in money of Ameren's real property and tangible personal property in service as of January 1, 2013, the Commission was legally bound to "apply that approach properly and consider all of the factors relevant to that approach."

*Snider*, 156 S.W.3d at 348. Depreciation must be considered when valuing property using the reproduction cost approach. *Stephen & Stephen Properties, Inc.*, 499 S.W.2d at 803. Because the assessors did not consider depreciation in applying the reproduction cost valuation methodology, Ameren established as a matter of law pursuant to section 138.430.1 that the assessors' valuations as sustained by the boards of equalization were unlawful and unfair.[26] The Commission erred in affirming the assessors' valuations.

Ameren's Points One, Two and Three on appeal are granted.

## Point Four

Ameren's fourth point on appeal argues that the Commission erred in affirming the

---

lars employing today's standards, a recognized cost approach methodology. However, to the extent the subject has been addressed, Missouri courts have observed that the reproduction/original cost methodology is generally most applicable to specialized uses of property. *See Snider*, 156 S.W.3d at 347 (noting that assessor used reproduction cost approach to value *specialized use of property* "by taking the actual cost of acquiring and improving the property and decreasing that amount to account for ... depreciation and depletion") (emphasis added). It is noteworthy that the Commission's Decision and Order found a natural gas pipeline system to be a "unique" use of property. [L.F. 22]

**25.** Though not strictly at issue in this case, as Cole County did not challenge Ameren's tangible personal property "Market Value" calculation, we observe that Mr. Sansoucy's valuation methodology is plainly inconsistent with section 137.122 as applies to tangible business personal property in service from and after January 2, 2006. Section 137.122.4 creates a rebuttable presumption of accuracy for true value in money calculated in the manner set forth in section 137.122—not coincidentally, the valuation methodology reflected in the Commission's 2013 form. As the proponent of a contrary valuation methodology, it would have been incumbent on the assessors, at least as to tangible personal property, to establish that Mr. Sansoucy's val-

uation methodology rebutted the statutory presumption.

**26.** We recognize the undercurrent in this case. The Commission's express directive to consider depreciation in connection with use of a reproduction cost valuation methodology in 2013 had a significant impact on Ameren's reported "Total Values" against which "Assessed Values" were to be calculated, because the Commission's form expressly required a depreciation deduction from original costs to determine "Market Values," where that apparently had not been the case prior to 2013, even though it is uncontested that original costs had routinely formed the basis for determining assessed values before 2013. *See* note 8, *supra*. However, the fact that neither Ameren nor the assessors appear to have concerned themselves with whether depreciation was duly considered before 2013 is immaterial to the disposition of this case. This case focuses solely on whether the reproduction cost valuation methodology required by the Commission for use in 2013, and concededly used by the assessors in 2013, was properly applied to determine the true value in money of Ameren's real property and tangible personal property in service as of January 1, 2013. As we have explained, it was not, as the assessors failed to consider depreciation.

assessors' valuations as sustained by the boards of equalization because the Commission held Ameren to an incorrect burden of proof by requiring Ameren to present substantial and persuasive evidence "to rebut the presumption of correct assessment by the Boards of Equalization." [L.F. 18] Ameren argues that the presumption of correctness was legislatively abolished in 1992 by the General Assembly's amendments to sections 138.060 and 138.431.

 As amended, section 138.060.1 provides that when a county board of equalization conducts its summary review of an assessor's valuation of property, "[t]here shall be no presumption that the *assessor's valuation* is correct." (Emphasis added.) If a party disagrees with the board of equalization's decision, the party may appeal to the Commission. Section 138.430.1. At the hearing before the Commission, section 138.431.4 as amended provides that "[t]here shall be no presumption that the *assessor's valuation* is correct." (Emphasis added.)

Neither section 138.060.1 nor section 138.431.4 addresses the presumption of correctness attached to valuations by a board of equalization. To date, Missouri courts have generally concluded that the presumption in favor of the assessed value fixed by a board of equalization remains intact. *See, e.g., Tibbs v. Poplar Bluff Associates. I, L.P.*, 411 S.W.3d 814, 822 (Mo. App. S.D. 2013) (Rahmeyer, J., dissenting) (holding that a taxpayer is required to "present[ ] substantial and persuasive evidence that [the Board's] valuation is erroneous"); *Rinehart*, 363 S.W.3d at 367 ("A presumption exists that the assessed value fixed by the Board of Equalization is correct."); *Cohen v. Bushmeyer*, 251 S.W.3d 345, 348 (Mo. App. E.D. 2008) ("A presumption exists that the assessed value fixed by the [board of equalization] is correct."). However, no Missouri case has squarely addressed the narrow question presented by Ameren's fourth point on appeal: whether the express purpose of sections 138.060.1 and 139.431.1 to negate a presumption of correctness in favor of an assessor's valuation is obviated by affording a presumption of correctness to a board of equalization decision which simply sustains an assessor's valuation?

We need not resolve this question. Regardless whether a presumption of correctness attached to the boards' of equalization valuations in this case, the presumption was "'one of fact and [was] rebuttable and only served the place of evidence until [Ameren] . . . came forward with the evidence hereinbefore set out.'" *State ex rel. Kahler*, 393 S.W.2d at 465 (quoting *Koplar v. State Tax Commission*, 321 S.W.2d 686, 693-94 (Mo. 1959)). Once Ameren came forward with evidence to establish that which the assessors in fact admitted—that the valuation methodology the assessors used, though correct, was unlawfully and unfairly applied due to the failure to consider depreciation—the presumption of correctness, *if any*, attached to the boards' of equalization valuations was defeated. *Cf. id.* (holding that presumption of correctness defeated when taxpayer alleged assessor's valuation was discriminatory, and presented evidence of discriminatory valuation methods).

Ameren's fourth point on appeal is denied as moot.

## Conclusion

Our grant of Ameren's first, second and third points on appeal requires us to reverse the circuit court's Judgment and to remand this matter for a determination of the appropriate depreciation to be taken against the Assessor's calculated "Market Value" of $53,252,400, an amount Ameren does not contest *except* for the Assessor's

failure to consider depreciation. Though Ameren would have us calculate depreciation pursuant to the Commission's 2013 form without remanding this matter, we would be exceeding our authority to do so. *See Drey*, 345 S.W.2d at 238 (noting that pursuant to section 536.140, an appellate court is empowered to modify an agency's decision, but "may not substitute its discretion for discretion legally vested in the agency," thus requiring remand to determine "the extent to which the assessments should be changed by the influence of factors" that were required to be considered).

Here, although the Commission's Assessor's Manual required the assessor to "arrive at a reasonable level of depreciation," and although the Commission's 2013 form recommended use of depreciation pursuant to IRS Publication 946, that same form also noted that "the determination of value is the responsibility of the county assessor." [L.F. 1817, 1823, 1824] We have explained that the Assessor's failure to apply *any* depreciation was legally erroneous. *See Stephen & Stephen Properties, Inc.*, 499 S.W.2d at 803-04 (rejecting assessors argument that true value in money of specialty real property is its costs of reproduction only, with no depreciation taken, because "[i]t is well known that a [real property improvement], especially one constructed for a special purpose, is rarely worth ... what it has cost to erect it"). However, the Assessor's error in failing to consider depreciation at all does not permit us to conclude as a matter of law that the Assessor was bound to calculate depreciation in the manner recommended by the Commission's 2013 form.[27]

" 'The word 'depreciation' and the phrase 'depreciation in value' are used and applied in the broader sense of meaning and include any reduction or lessening in value.' " *Stephen & Stephen Properties, Inc.*, 499 S.W.2d at 803 (quoting *Riccardi v. United States Fidelity and Guaranty Co.*, 434 S.W.2d 737, 741 (Mo. App. 1968)). We have already explained that the Commission possessed a logical rationale for recommending use of Publication 946, (essentially, the section 137.122 "life of asset" depreciation model applicable to tangible personal property), for both tangible personal property and unique real property—fixtures that are components of natural gas distribution pipelines. However, we recognize that depreciation models vary. *See, e.g., id.* (" 'Depreciation is considered as being of two types; conditions which are purely physical such as those caused by deterioration from wear and tear, and conditions usually referred to as functional depreciation which covers the effect of obsolescence and loss of adaptability. Even changes in style can be a factor in functional depreciation. The factors involved in a particular case often are complex and subtle.' ") (quoting *Cone*, 338 S.W.2d at 27). At the hearing before the Commission, the assessors argued against use of the Commission's recommended "life of asset" depreciation model, contending that the "modified accelerated cost recovery system depreciation published in Publication 946 ... of the Internal Revenue Code [is] for use in reporting income tax [and] is not market depreciation." [L.F. 56] The resolution of how depreciation should be calculated must first be determined in this case by the Commission in the exercise of its discretion.[28]

---

27. Even as to tangible personal property, section 137.122.4 provides that the use of "life of asset" depreciation multiplied by original costs will produce a *presumptively* correct determination of the true value in money of tangible personal property, subject to being rebutted in the manner set forth in the statute.

28. As to tangible business personal property, we remind that section 137.122 creates a re-

The Judgment of the circuit court affirming the Commission's Decision and Order is reversed. This matter is remanded to the Circuit Court of Cole County for remand to the Commission to calculate the true value in money of Ameren's real property in service in Cole County as of January 1, 2013 by determining the amount of depreciation to be deducted from $53,252,400, the "Market Value" determined by the Assessor without regard to depreciation.

All concur

Appendix A

Ex . ~~28~~ 3|

**STATE TAX COMMISSION OF MISSOURI**
**ASSESSOR MANUAL**

| CHAPTER: | ASSESSMENT OF NATURAL GAS DISTRIBUTION COMPANIES |
|---|---|
| REVISION DATE: 2/5/2015 | Page 1 of 7 |

**7.4 ASSESSMENT OF NATURAL GAS LOCAL DISTRIBUTION COMPANIES**

Natural gas local distribution companies are companies serving intrastate customers, namely residential and commercial/industrial customers. At this time, these companies are locally assessed. Originally, these companies were primarily located within the boundaries of one county. However, due to system expansions and company mergers, many companies now cross county and state boundaries. The companies supplying gas to the distribution companies (known as transmission companies) are typically interstate in nature. Some also supply large industrial customers. These companies are centrally assessed by the State Tax Commission.

All companies rely on original costs as a starting point. It is important for the assessor to arrive at a reasonable level of depreciation.

Recent statutory changes states that real property is "stationary property used for transportation of liquid and gaseous products, including, but not limited to, petroleum products, natural gas, water, and sewage." Gas distribution mains are required to be assessed as real property.

Valuation and parceling of structures, such as offices, should be consistent with similar property in the county. Other real property, such as pipe, should be parceled in the taxing jurisdiction where it is located. Personal property values should be allocated to the taxing jurisdiction by location.

The following forms were prepared as a guide to assist the assessor in the gathering of data. Please note that these forms are not a requirement, but merely represent a guide for the types of information to be gathered to assess natural gas distribution companies.

# Appendix A

VII-7.4-1

STCR01781
**1817**

buttable presumption that use of the "life of asset" depreciation methodology therein described results in an accurate calculation of true value in money.

**State Tax Commission of Missouri**

## NATURAL GAS DISTRIBUTION COMPANY - TRANS. AND DIST. PLANT: REAL ESTATE 2013

COMPANY

COUNTY: TAX DISTRICT/CODE:
 or UPN/ACCOUNT #:

| Account Number: Account Name: | 367 MAINS | 376 MAINS | 380 SERVICES | Yearly Total | | Market Value |
|---|---|---|---|---|---|---|
| Construction Work in Progress | | | | $0.00 | 100.00% | $0 |
| 2012 | | | | $0.00 | 96.25% | $0 |
| 2011 | | | | $0.00 | 89.03% | $0 |
| 2010 | | | | $0.00 | 82.35% | $0 |
| 2009 | | | | $0.00 | 76.18% | $0 |
| 2008 | | | | $0.00 | 70.46% | $0 |
| 2007 | | | | $0.00 | 65.18% | $0 |
| 2006 | | | | $0.00 | 60.29% | $0 |
| 2005 | | | | $0.00 | 55.77% | $0 |
| 2004 | | | | $0.00 | 51.31% | $0 |
| 2003 | | | | $0.00 | 46.85% | $0 |
| 2002 | | | | $0.00 | 42.38% | $0 |
| 2001 | | | | $0.00 | 37.92% | $0 |
| 2000 | | | | $0.00 | 33.46% | $0 |
| 1999 | | | | $0.00 | 29.00% | $0 |
| 1998 | | | | $0.00 | 24.54% | $0 |
| 1997 | | | | $0.00 | 20.08% | $0 |
| 1996 | | | | $0.00 | 20.00% | $0 |
| <1996 | | | | $0.00 | 20.00% | $0 |

Original Costs are reported by year placed in service

Transmission and Distribution Plant, Total Value $0

Transmission and Distribution Plant, Assessed Value $0

## State Tax Commission of Missouri

| NATURAL GAS DISTRIBUTION CO. - TRANS. AND DIST. PLANT: PERSONAL PROPERTY 2013 | | | | | | |
|---|---|---|---|---|---|---|
| COMPANY | | | | | | |
| COUNTY: | | | | TAX DISTRICT/CODE: or UPN/ACCOUNT #: | | |

| Account Numbers: | | 368, 369, 377, 378, 379 | 381, 382, 383, 384, 385 | 370, 371, 386, 387 | | | |
|---|---|---|---|---|---|---|---|
| Account Descriptions: | | Compressor, Measuring & Reg. Station Equipment | Meters & Install., House Reg. & Install., Ind. Meas. & Reg. Equip. | Communication & Other Equip., Other Property on Customers' Premises | Yearly Total | | Market Value |
| Construction Work In Progress | | | | | $0.00 | 100.00% | $0 |
| Original Costs are reported by year placed in service | 2012 | | | | $0.00 | 96.25% | $0 |
| | 2011 | | | | $0.00 | 89.03% | $0 |
| | 2010 | | | | $0.00 | 82.35% | $0 |
| | 2009 | | | | $0.00 | 76.18% | $0 |
| | 2008 | | | | $0.00 | 70.46% | $0 |
| | 2007 | | | | $0.00 | 65.18% | $0 |
| | 2006 | | | | $0.00 | 60.29% | $0 |
| | 2005 | | | | $0.00 | 55.77% | $0 |
| | 2004 | | | | $0.00 | 51.31% | $0 |
| | 2003 | | | | $0.00 | 46.85% | $0 |
| | 2002 | | | | $0.00 | 42.38% | $0 |
| | 2001 | | | | $0.00 | 37.92% | $0 |
| | 2000 | | | | $0.00 | 33.46% | $0 |
| | 1999 | | | | $0.00 | 29.00% | $0 |
| | 1998 | | | | $0.00 | 24.54% | $0 |
| | 1997 | | | | $0.00 | 20.08% | $0 |
| | 1996 | | | | $0.00 | 20.00% | $0 |
| | < 1996 | | | | $0.00 | 20.00% | $0 |

Transmission and Distribution Plant, Total Value $0

Transmission and Distribution Plant, Assessed Value $0

STCR01789